**SOUTHWEST CENTER FOR BI-OLOGICAL DIVERSITY and Robin Silver, M.D., Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, et al., Defendant.**

**No. Civ.98CV1022–PHX–SMM.**

United States District Court, D. Arizona.

Sept. 29, 2000.

Matthew P. Millea, Foreman Bouma & Millea, PC, Phoenix, AZ, for plaintiffs.

Michael R. Arkfeld, U.S. Attorney's Office, Phoenix, AZ, for defendants.

## MEMORANDUM OF DECISION AND ORDER

McNAMEE, Chief Judge.

Pending before the Court is Plaintiffs' Motion for Summary Judgment and Defendants' Cross–Motion for Summary Judgment. After considering the arguments raised by the parties in their briefing, the Court has concluded that oral argument is unnecessary and now issues the following ruling.

## BACKGROUND

The northern goshawk, a rare bird of prey present in scattered areas of forest throughout the American West, stands at the center of a long-standing conflict between environmental advocates and the United States government. Environmentalists have repeatedly sought to have the government list the northern goshawk as "endangered" under the Endangered Species Act. The United States Fish and Wildlife Service, however, has concluded that the available scientific evidence does not support listing the goshawk as either threatened or endangered at this time, although the goshawk remains a "candidate species." *See* 59 Fed.Reg. 58982, 58990 (Nov. 15, 1994); 50 C.F.R. Part 424.2(B). Any decision to grant the goshawk protected status could have substantial implications for the timber industry throughout the west.

The government's leading researcher involved in studies of the northern goshawk is Richard T. Reynolds, Ph.D. Reynolds has been studying the goshawks of the Kaibab Plateau north of the Grand Canyon since 1991, with the goal of completing a comprehensive ten-year study of the health of the species. On January 31, 1998, Reynolds and another researcher, Suzanne M. Joy, issued a report for the Arizona Game & Fish Department entitled "Distribution, Territory Occupancy, Dispersal, and Demography of Northern Goshawks on the Kaibab Plateau, Arizona."

In June, 1998, the Fish and Wildlife Service ("FWS") issued a "status review" on the goshawk. On June 29, 1998, FWS published a Twelve Month Finding on the Petition to List the Northern Goshawk. 63 Fed.Reg. 35183 (June 29, 1998). In the Twelve Month Finding, FWS relied on the status review and found that the goshawk should not be placed on the endangered species list. The status review cited the Reynolds and Joy paper at least 80 times.

Although the dispute between the parties over the status of the goshawk is far-ranging, this litigation presents only a narrow issue regarding the Freedom of Information Act ("FOIA"). In this regard, *the Court emphasizes that its analysis is limited to the relevant FOIA provisions. The Court need not and does not express any opinions or arrive at any conclusions regarding the health of the goshawk population, the preservation of goshawk habitat, the timber industry, timber management policies, or the Endangered Species Act.*

Turning to the specific FOIA matters at issue, Plaintiffs submitted a FOIA request to Reynolds at the United States Forest

Service Rocky Mountain Research Station on March 12, 1998. Plaintiffs sought access to the data underlying Reynolds' report. The categories of material sought by Plaintiffs included: 1) data about the Kaibab Plateau population of the red squirrel, the goshawk's primary ·prey; 2) data from Reynolds' radio-tracking study of the Kaibab goshawks; 3) all records relating to the funding of the radio-tracking study; 4) a list containing the location of all identified territories and nest sites on the Kaibab Plateau; 5) all information regarding activity at all known nest sites from 1991 through 1996; and 6) maps showing all timber management activities on the Kaibab Plateau.

Reynolds and the Forest Service initially did not respond to Plaintiffs' request. Not until after Plaintiffs initiated this lawsuit did Defendants provide any responsive records. Defendants then gave Plaintiffs selected records relevant to each of the six categories of information identified by Plaintiffs. However, Defendants also withheld some documents relating to each of Plaintiffs' requests, with the exception of timber management maps, which Defendants fully disclosed. Defendants asserted that the withheld documents are not subject to disclosure because they fall under FOIA exception number five. *See* 5 U.S.C. § 552(b)(5). Section 552(b)(5) protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with another agency."

On August 3, 1999, the Court remanded this case to the Department of Interior ("DOI") for a determination regarding the potential applicability of section 207 of the National Parks Omnibus Management Act of 1998 ("Section 207"), 16 U.S.C. § 5937, which had been enacted on November 13, 1998. On November 19, 1999, the DOI issued a Letter of Determination holding that Section 207 applies to at least some of the data originally requested by Plaintiffs and withheld by the Forest Service. (Defs.' Exh. 1.)

The DOI found that the FOIA request for information solicited data that could be lawfully withheld under section 207 because it concerns a National Park System resource which is rare, threatened or endangered. The DOI found that, although the Kaibab Plateau population of northern goshawks is located largely outside of the boundaries of the Grand Canyon National Park, its gene pool constitutes a "rare" National Park System resource because the survival of the entire population is necessary to the continued presence of the goshawk in the park.

The DOI further determined that the Kaibab Plateau population of northern goshawks would experience an unreasonable risk of harm from human interference as a result of the release of the locations of their nest sites. Consequently, the DOI concluded that information concerning the locations of goshawk nest sites was protected under Section 207. Specifically, the DOI recommended withholding of: 1) all locational data accurate to an area less than one square mile in size; 2) all radio-telemetry frequency information; and 3) all specific data about the nature of the goshawk ecosystem that would reveal information about the locations of specific goshawk nests on the Kaibab Plateau.

Plaintiffs have now moved for summary judgment in order to compel Defendants to produce the remainder of the information sought by Plaintiff. Defendants have filed a cross-motion for summary judgment, arguing that the undisclosed materials are exempt from production under FOIA. In addition, Plaintiffs assert that, in the event the Court determines that some of the material withheld by Defendants is

exempt from disclosure, the Court should conduct an *in camera* review of the documents to assure that only the properly exempt material, and nothing more, is withheld.

## STANDARD OF REVIEW

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jesinger v. Nevada Federal Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). Substantive law determines which facts are material. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Jesinger*, 24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Jesinger*, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548; *see also Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir.1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial.

*See Celotex*, 477 U.S. at 317, 106 S.Ct. 2548. The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir.1995).

■ The Court conducts a *de novo* review of agency determinations to withhold materials under FOIA. *See* 5 U.S.C. § 552(a)(4)(B); *Department of the Air Force v. Rose*, 425 U.S. 352, 379–80, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). "Unless documents fall within one of the nine specific exemptions to the disclosure requirement of the FOIA, they are presumed to be available for public inspection." *National Wildlife Fed'n v. United States Forest Service*, 861 F.2d 1114, 1116 (9th Cir. 1988). "FOIA's purpose is to encourage disclosure, and to that end, its exemptions are to be interpreted narrowly." *Assembly of the State of California v. United States Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir.1992). The government has the burden to prove that the records it wishes to withhold fall within one of the nine exemptions. *See id.; see also* 5 U.S.C. § 552(a)(4)(B).

■ If necessary, a court may conduct an *in camera* review of a requested record to determine which parts of the document are subject to exemption under subsection (b) and may lawfully be withheld, and which should be released. *See* 5 U.S.C. § 552(a)(4)(B). However, the Court need not conduct an *in camera* review if it has a factual basis to determine which parts of the document may properly be withheld. *See Lewis v. I.R.S.*, 823 F.2d 375, 378 (9th Cir.1987).

## DISCUSSION

### A. Exemption 5: Inter- and Intra-agency Memoranda That Would be Unavailable in Civil Litigation

 The fifth enumerated FOIA exemption set forth in 5 U.S.C. § 552(b) exempts: "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." As construed by the Supreme Court, exemption five "shields 'those documents, and only those documents, normally privileged in the civil discovery context.'" *Assembly*, 968 F.2d at 920 (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)). Thus, exemption five includes a variety of privileges. Here, Defendants attempt to rely on the well-established deliberative process privilege and on a less well-defined "research data privilege."

#### 1. The Deliberative Process Privilege

 The deliberative process privilege exists in order to "allow agencies freely to explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny." *Assembly*, 968 F.2d at 920. Congress did not intend to hinder the effectiveness of government by forcing agencies to "operate in a fishbowl." S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965), *quoted in Assembly*, 968 F.2d at 920. In order to protect the deliberative process without sacrificing FOIA's preference for disclosure, the courts have limited the deliberative process privilege to materials that are both "predecisional" and "deliberative." *See,*

*e.g., Assembly*, 968 F.2d at 920; *National Wildlife*, 861 F.2d at 1117.

 A document is "predecisional" if it is "prepared in order to assist an agency decisionmaker in arriving at his decision." *Renegotiation Board v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975). A document is "deliberative" if it is "actually . . . related to the process by which policies are formulated." *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 774 (D.C.Cir.1978), *quoted in National Wildlife*, 861 F.2d at 1117. As a "useful rule-of-thumb," disclosure of factual materials is generally favored, while material containing "preliminary opinions and explorations" is privileged. *Assembly*, 968 F.2d at 921. The key inquiry, however, "is whether revealing the information exposes the deliberative process," regardless of whether the material consists of fact or opinion. *Id.*

Here, Plaintiffs have requested disclosure of the raw data underlying Reynolds' studies. Plaintiffs argue that this information is purely factual and reveals nothing about the deliberative process of the agency. Defendants respond that, while the research data is factual, it is also integral to the deliberative process. Specifically, Defendants argue that release of the withheld data regarding specific nest sites could lead to harassment of the nesting goshawks, which could invalidate Reynolds' long-term study and impair the ability of the Forest Service to formulate an appropriate management plan. (Defs.' Resp. to Pls.' MSJ at 15–16.)[1]

---

1. The Court notes that even if Reynolds' data could be characterized as deliberative, it could still be obtained through discovery in an appropriate lawsuit. (*See supra* p. 942 (discussing research data privilege).) The government has already publicly relied on Reynolds' research in deciding not to protect the goshawk, and so plaintiffs seeking to challenge that decision would be entitled to access to Reynolds' materials. *See* Fed.R.Civ.P. 26; Pl.'s SOF ¶ 4 & Exh. 1 ¶ 5.

Defendants essentially argue that Reynolds' research data is privileged because release of the date *might* result in humans disturbing nesting goshawks which *might* affect or even invalidate Reynolds' study which *might* ultimately affect the management decisions of the Forest Service. Nothing in the law supports extending the protection of exemption five to government documents based on such a tenuous connection to the deliberative process. Indeed, to do so would be inconsistent with the requirement that FOIA exemptions be construed narrowly. *See, e.g., Federal Trade Commission v. Grolier, Inc.,* 462 U.S. 19, 23, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983) ("Congress intended Exemption 5 to be as narrow[ ] as [is] consistent with efficient government operations" [internal quotations omitted] [alterations in original]); *Assembly,* 968 F.2d at 920. In addition, even if Defendants theory were persuasive, it would justify withholding only the specific locations of nest sites and nothing more. Defendants, however, have withheld a much wider range of materials.

Defendant relies principally on two cases in support of its position: *Army Times Publ'g Co. v. Department of the Air Force,* 998 F.2d 1067 (D.C.Cir.1993), and *Farmworkers Legal Services v. United States Dep't of Labor,* 639 F.Supp. 1368 (E.D.N.C.1986). In *Army Times,* the Air Force Times sought the results of surveys of Air Force personnel. The Air Force claimed the information was protected under the deliberative process privilege, arguing that the "survey respondents were participants in the deliberative process of agency policymaking, and therefore their 'opinions and recommendations,' even when tabulated in aggregate form, were exempt from disclosure under Exemption 5." *Army Times,* 998 F.2d at 1069. The D.C. Circuit held that the survey results

would be privileged only if the Air Force could demonstrate that their release "would actually inhibit candor in the decision-making process if made available to the public." *Id.* at 1072.

Defendants would analogize the survey results in *Army Times* to Reynolds' research data. The analogy, however, does not hold up. The concern of the *Army Times* court with candor and the open expression of opinions and recommendations from human subjects is consistent with the reasons for the deliberative process exception but simply has no application to purely factual data about birds. Defendants have only raised the possibility that release of the information could adversely affect one study of the goshawk. They have not shown that release "would actually inhibit" the decision-making process, and so have not carried their burden of showing that Reynolds' data falls within the privilege.

Defendants also rely on the *Farmworkers Legal Services* decision from the Eastern District of North Carolina. In *Farmworkers,* Plaintiffs sought a list of the names and addresses of farms in North Carolina whose migrant farmworker housing would be inspected in the coming year. *See* 639 F.Supp. at 1369. The Court affirmed the Department of Labor's decision to withhold the information. Defendants state that the court applied exemption five because "the subsequent inspection would be used for a final review and modification of certain Department of Labor standards." [2] (Def.s' Resp. to MSJ at 15.) Defendants misread the opinion. The North Carolina court did hold that exemption five applied to the inspection list, but only because the specific list sought was a recommendation regarding which camps should be inspected, was subject to further

---

**2.** Defendants do not support this statement with a citation to the case.

review, and contained "selective fact" that could reveal the deliberative process.[3] *Farmworkers*, 639 F.Supp. at 1373.

Like *Army Times*, the *Farmworkers* opinion does not support the application of the deliberative process exemption to Reynolds' research data. The raw research data is not a recommendation, is not subject to alteration on further review by others in Reynolds' agency, and is not selective. Whatever Reynolds and the Defendants might subsequently do with the data, the data itself does not expose the deliberative process.

In addition to being non-deliberative, the research data also does not appear to be pre-decisional within the meaning of the deliberative process privilege. Defendants argue that the data is pre-decisional because it "is going to be used to determine whether the goshawk's continuing population levels are in harmony with the management of the forest lands by the Department of Agriculture." (Defs.' Resp. to MSJ at 16.) However, Defendants do not explain exactly when or how the results of the study, much less the underlying data, will be used.

The Ninth Circuit has rejected attempts to characterize information as pre-decisional by reference "to a decision that possibly may be made at some undisclosed time in the future." *Assembly*, 968 F.2d 916. Without this limitation, the *Assembly* court feared that "[a]ny memorandum always will be 'predecisional.'" *Id.* Here, the Court finds that the potential future use of Reynolds' data is too remote to render the requested material predecisional. *See also Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 868 (D.C.Cir.1980) ("Characterizing these documents as 'predecisional' simply because they play into

an ongoing audit process would be a serious warping of the meaning of the word.").

The Court therefore concludes that the deliberative process privilege does not apply to the information withheld by Defendants in response to the first, second, fourth and fifth categories of material sought by Plaintiffs. The third category of material sought by Plaintiffs included copies of all materials "addressing the telemetry of juvenile goshawks and/or the funding of the radio-tracking of juvenile goshawks on the Kaibab Plateau." Some of the information withheld by Defendants in response to this request may constitute predecisional and deliberative material relating to the budgeting of the juvenile tracking study.

## 2. The Research Data Privilege

Defendants also argue that Reynolds' data falls under exemption five because exemption five incorporates a "research data privilege ." "Exemption five incorporates the privileges which the Government enjoys under the relevant statutory and case law in the pretrial discovery context." *Renegotiation Bd. v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 184, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975). Documents that would not be "routinely" or "normally" disclosed in civil discovery upon a showing of relevance are protected under exemption five. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148–149, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).

Rule 26(c)(7), Fed.R.Civ.P., recognizes that the disclosure of "confidential research, development or commercial information" may be limited by a court "for good cause shown." Similarly, the Supreme Court has extended exemption five

---

**3.** The court also found that the list was protected under exemption seven, because its release could interfere with enforcement proceedings. *Farmworkers*, 639 F.Supp. at 1373–1374.

to confidential commercial information generated in the process of awarding a government contract. *Federal Open Market Comm. v. Merrill*, 443 U.S. 340, 359, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979). However, efforts to extend exemption five beyond the executive privilege and the attorney-client privilege "must be viewed with caution." *Id.* at 2810.

The Seventh Circuit has, on two occasions, recognized that research data may be entitled to some protection in the course of civil discovery. *See Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556 (7th Cir.1984); *Dow Chemical Co. v. Allen*, 672 F.2d 1262 (7th Cir.1982). In *Dow*, the Seventh Circuit affirmed a district court decision to quash a subpoena in an administrative proceeding as unduly burdensome. 672 F.2d at 1278. However, the Court did not rely on, or even mention, a "privilege" for research data in its discussion. Instead, the court balanced the burdens and benefits of compliance with the subpoenas and found that, on the specific facts of the case, the burden was unreasonable. *See id.* at 1266–1277.

In *Deitchman*, the Seventh Circuit discussed a request for production of data from the Registry for Hormonal Transplacental Carcinogenesis, a unique "repository of data" on "clear cell adenocarcinoma of the genital tract." 740 F.2d at 557. The court "agree[d] arguendo that the Registry files may enjoy a qualified privilege and are not to be pried into unnecessarily." *Id.* at 560–561. Nonetheless, the circuit remanded the case to the district court with directions to enter a protective order that would allow disclosure of the necessary information. *See id.* at 566.

Neither of the Seventh Circuit cases establish a privilege for research data. At best, the cases stand for the unremarkable proposition that, in specific situations, research material may be entitled to some

protection. Exemption five, however, protects only material that would not be normally or routinely disclosed in civil discovery. Defendants' argument that research data is not normally disclosed is inconsistent with the common practices of civil litigation before the United States courts. Under today's federal rules, research data, like all relevant information, must be disclosed even without a discovery request. The mandatory disclosure requirements of Rule 26(a)(1) extend to "all documents, *data compilations*, and tangible things . . . that are relevant to disputed facts alleged with particularity in the pleadings." Similarly, expert witnesses must disclose ."the data or other information considered by the witness in forming the opinions." Fed .R.Civ.P. 26(a)(2)(B).

The only circuit court of appeals to consider whether confidential research information is exempt under FOIA has concluded that it is not. *See Burka v. United States Dep't of Health and Human Servs.*, 87 F.3d 508, 521 (D.C.Cir.1996). Citing a wide variety of cases in which courts had refused to protect research information, the D.C. Circuit concluded that confidential research information is "routinely available" in litigation and so not subject to protection under exemption five. *Id.*

█ Moreover, even if a research data privilege exists in some circumstances, it would not apply in this case. Courts which have addressed the protection of research data have expressed concerns about protecting academic freedom and publication rights. *See, e.g., Burka*, 87 F.3d at 519–521; *Deitchman*, 740 F.2d at 560; *Dow*, 672 F.2d at 1273–1275.

Here, however, Reynolds has already published the results of his research. Indeed, it was the publication that resulted in Plaintiff's request for the underlying data. Reynolds is not a private researcher

in academia; rather, his work is paid for by the government and conducted for public purposes. None of Reynolds' data was gathered from subjects who were promised anonymity. Nor has Reynolds or Defendants made any showing that disclosure of the data would be burdensome. Finally, the rules of discovery would not permit the government to conceal the basis for Reynolds' conclusions in a lawsuit challenging the government's classification of the goshawk, given that the government specifically relied on Reynolds' conclusions in arriving at that classification.

The Court therefore concludes that research data such as that at issue here is normally and routinely disclosed in the course of civil discovery, that FOIA exemption five does not protect research data, and that, to the extent any privilege for confidential research data may exist, it would not apply here. Defendants must disclose any materials they have withheld solely on the basis of a research data privilege.

## B. Exemption Three and Section 207 of the NPOMA

Defendants originally relied only on exemption five in withholding information in response to Plaintiffs' FOIA request. However, on November 13, 1998, Congress passed the National Parks Omnibus Management Act of 1998 ("NPOMA").[4] Section 207 of NPOMA, entitled "Confidentiality of Information," provides:

> Information concerning the nature and specific location of a National Park System resource which is endangered, threatened, rare or commercially valuable, of mineral or paleontological ob-

jects within units of the National Park System, or of objects of cultural patrimony within units of the National Park System, may be withheld from the public in response to a request under section 552 of Title 5, unless the Secretary determines that—(1) disclosure of the information would further the purpose of the unit of the National Park System in which the resource or object is located and would not create an unreasonable risk of harm, theft, or destruction of the resource or object, including individual organic or inorganic specimens; and (2) disclosure is consistent with other applicable laws protecting the resource or object.

16 U.S.C. § 5937. FOIA exemption three, in turn, protects material:

> specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3).

Defendants now assert that the information they have withheld in response to Plaintiffs' FOIA request is protected under exemption three because: 1) NPOMA section 207 is the type of non-disclosure statute incorporated by FOIA exemption three; 2) the goshawk is a rare National Park System resource; and 3) release of the information sought by Plaintiffs would

4. The Court has already determined that Defendants may rely on section 207, even though it was enacted after Plaintiffs submitted their FOIA request. *See* Order of Aug. 4, 1999 [Doc. No. 24] at 2 (analyzing retroactivity issue); *see also Lee Pharmaceuticals v.* *Kreps,* 577 F.2d 610, 614 (9th Cir.1978) ("Although the amended version of Exemption 3 did not become effective until this appeal was pending, we apply the amended exemption as the law currently governing the duties of government agencies under FOIA.")

create an unreasonable risk of harm to the goshawk.

### 1. Is Section 207 an Exemption Three Statute?

 In analyzing an exemption three claim, a court must first determine whether the non-disclosure statute satisfies the criteria of exemption three, and then determine whether the information sought is protected by the non-disclosure statute. *See Association of Retired R.R. Workers*, 830 F.2d at 332 (referring to two-step inquiry set forth in *Irons & Sears v. Dann*, 606 F.2d 1215, 1220 (D.C.Cir.1979)). Plaintiffs assert that section 207 neither "requires that matters be withheld from the public in such a manner as to leave no discretion on the issue" nor "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3).

The Court agrees that section 207 does not require the withholding of information "in such a manner as to leave no discretion on the issue." Section 207 provides that information "may be withheld," not that it must be withheld. The section further provides that information must be disclosed if the Secretary of the Interior determines that release of the information would not create an unreasonable risk of harm to the subject of the information and would be consistent with other laws protecting the subject of the information. This determination, however, necessarily involves some exercise of discretion.

Because section 207 leaves the agency with some discretion, the statute satisfies the requirements of exemption three only if it "refers to particular types of matters to be withheld." The Ninth Circuit test for determining whether a non-disclosure statute satisfies the second prong of exemption three is set forth in *Lessner v.*

*United States Dep't of Commerce*, 827 F.2d 1333, 1335 (9th Cir.1987):

> Whether information is exempt from disclosure is a Congressional determination, not an administrative one. Therefore, in determining whether material is exempt under section 3(B), a court must consider the underlying congressional intent to exempt material from the FOIA. A court must then determine, under subsection (B), whether congress has articulated particular criteria to guide the agency charged with administering the law. If only very general benchmarks for secrecy are set forth, the agency is delegated too much discretion and the criteria of subsection (B) are not met.

The Congressional intent behind section 207 is apparent from the face of the statute. The sole function of section 207 is to protect information from disclosure in response to a FOIA request: the categories of information described in the statute "may be withheld from the public in response to a request under section 552 of Title 5 . . . ." 16 U.S.C. § 5937. Therefore, Congress must have intended section 207 to be an exemption three statute. *See Association of Retired R.R. Workers, Inc. v. United States R.R. Retirement Bd.*, 830 F.2d 331, 333 (D.C.Cir.1987) ("When the plain meaning establishes that the statute is a withholding statute, there is no need to consult the legislative history.").

The remaining question, then, is whether section 207 contains sufficiently particular criteria to guide non-disclosure. The statute articulates a series of limitations on the agency's discretion to withhold information. Only three categories of materials are subject to withholding: 1) information concerning endangered, threatened, rare or commercially valuable National Park System resources; 2) information concerning mineral or paleontological objects with-

in a National Park; and 3) information concerning objects of cultural patrimony within a National Park. In addition, only information concerning "the nature and specific location" of its subject may be withheld. Finally, such information may not be withheld if disclosure would be consistent with Park System and other applicable laws and would not create a risk of harm to the subject of the information.

Certainly Congress could have drafted more particular criteria into section 207. However, the Ninth Circuit has found similarly broad statutes to be sufficient under exemption three. For example, in *Lessner*, the Circuit considered the following language: "information obtained for the purpose of consideration of, or concerning, license applications under this Act shall be withheld from public disclosure unless the release of such information is determined by the Secretary to be in the national interest." *Lessner*, 827 F.2d 1333, 1335 (9th Cir.1987) (considering section 12(c)(1) of the Export Administration Act ("EAA"), 50 U.S.C.App. § 2411(c)). The Circuit found the statute sufficiently definite under exemption 3, notwithstanding its broad authorization for withholding of all information "concerning" license applications. Nor was the Court disturbed by the Secretary's freedom to permit disclosure whenever release would be "in the national interest." *See id.* at 1336–1337.

Section 207 contains the same "concerning" language as the EAA provision at issue in *Lessner*, and similar discretionary guidelines for the release of information. The Court therefore concludes that, consistent with the purpose of exemption three, section 207 does not permit "wholly discretionary non-disclosure" or give "un-fettered power to agencies to withhold information from the public." *Lee Pharmaceuticals v. Kreps*, 577 F.2d 610, 615 (9th Cir.1978). Instead, the Court finds that section 207 satisfies the requirements of exemption three.

**2. Does Section 207 Encompass the Type of Records Sought by Plaintiffs?**

■ Having determined that section 207 is an exemption three statute, the Court must next consider whether the information sought by Plaintiffs is protected by section 207. Plaintiffs argue that section 207 does not apply to their request for a number of reasons. First, Plaintiffs argue that NPOMA in general, and section 207 in particular, have no application to the Forest Service or to Forest Service records. As the records here were created by and are in the possession of the Forest Service, Plaintiffs argue that Defendants cannot rely on Section 207.

However, nothing in Section 207 indicates that it is limited to records created by or in the possession of the Park System. The statute does *not* provide that "Park System records" concerning National Park System resources may be withheld by the Park System or the Secretary of the Interior. Rather, the statute provides that "information" concerning National Park System resources may be "withheld from the public", without specifying the location or source of the protected information or who must do the withholding. Plaintiffs have cited nothing in the language or history of NPOMA that would indicate that section 207 does not apply to the records of agencies other than the Park System.[5]

---

5. *Paisley v. CIA,* 712 F.2d 686 (D.C.Cir.1983), on which Plaintiffs rely, is relevant only to the issue of whether the records in question are records of the Park System or of the Forest Service. In *Paisley,* the D.C. Circuit had to determine whether records produced and possessed by the CIA were nonetheless Congressional records, and therefore exempt

In addition, one of the plain purposes of section 207 is the protection of Park System resources. *See* 16 U.S.C. § 5937(1) & (2) (specifying that the Secretary of the Interior must determine whether disclosure would "create an unreasonable risk" to the resources and be consistent with other laws "protecting the resource"). If section 207 applies only to records in the possession of or created by the Park System, and not to records in the possession of other agencies, the apparent Congressional goal of protecting Park System resources would be compromised. As the facts of this case demonstrates, the work of other federal agencies often overlaps with the work of the Park System.

Finally, the records here, although not produced or possessed by the Park System, nonetheless relate to the management of Grand Canyon National Park and the purposes behind section 207. Section 207 is codified as part of a subchapter of Title 16 devoted to "National Park System Resource Inventory and Management." The purposes of this subchapter include "to encourage others to use the National Park System for study to the benefit of park management as well as broader scientific value," and "to encourage the publication and dissemination of information derived from studies in the National Park System." 16 U.S.C. § 5931. In addition, the subchapter authorizes the Secretary of the Interior to "solicit, receive, and consider requests from Federal or non-Federal public or private agencies . . . for the use of any unit of the National Park system for purposes of scientific study." 16 U.S.C. § 5934.

Thus, the statutory sections surrounding section 207 expressly contemplate studies by outside individuals and organizations, including other federal agencies, involving the National Park System. Section 207 should be read in its statutory context to protect the information generated by these studies, regardless of whether the National Park System itself generates or possesses the information. Here, Reynolds has a park-issued permit for his study and provides information from his study to Grand Canyon National Park "that the Park uses in its management program." (Defs.' SOF, Exh. 1.) The Court therefore concludes that section 207 may apply to the information sought by Plaintiffs, notwithstanding that the information is possessed by the Forest Service and not the National Park System.

■ Next, Plaintiffs raise two related arguments involving the types of information protected by section 207. Plaintiffs argue that section 207 does not apply to information about wildlife that is not endangered or threatened, as these terms are used under the Endangered Species Act. Plaintiffs also argue that section 207 does not apply to information about wildlife located outside a unit of the National Park System. Defendants maintain that section 207 extends to information about all rare wildlife that has a "demonstrable functional connection" to a unit of the National Park System, whether or not the wildlife is actually within the boundaries of a park.

Section 207 protects: "Information concerning the nature and specific location of a National Park System resource which is endangered, threatened, rare, or commercially valuable, of mineral or paleontological objects within units of the National Park System, or of objects of cultural patrimony within units of the National Park

from FOIA, because the CIA investigation had been requested by Congress. *See Paisley,* 712 F.2d at 695–696. *Paisley* sheds no light on the critical question of whether section 207 extends to non-Park System records.

System." 16 U.S.C. § 5937. Defendants urge the Court to read the statute as creating a list of three categories of material subject to protection: 1) information concerning the nature and specific location of a National Park System resource which is endangered, threatened, rare, or commercially valuable; 2) information concerning the nature and specific location of mineral or paleontological objects within units of the National Park System; and 3) information concerning the nature and specific location of objects of cultural patrimony within units of the National Park System. Defendants assert that information about the goshawk is protected under the first category, because the goshawk is a rare National Park System resource.

In response, Plaintiffs argue that the term "rare" in the statute should be interpreted to apply only to inanimate objects, and not to wildlife. Plaintiffs note that the terms "endangered" and "threatened" are regularly used to apply to wildlife under federal law, but that "rare" is not. However, Plaintiffs' proposed interpretation is at odds with the phrasing of the statute. The modifiers "endangered, threatened, rare, or commercially valuable" refer to National Park System resources. These modifiers do not refer to mineral or paleontological objects or objects of cultural patrimony, which need only be "within units of the National Park System."

The categories of objects of cultural patrimony, mineral objects, and paleontological objects appear to encompass the entire field of non-biological, inanimate resources that might be found in a National Park. "National Park System resource," then, must refer to animate, biological resources such as plants and animals, including the goshawk. The language of the statute indicates the Congressional choice to protect such resources not only if they are "endangered" or "threatened", terms of art under the Endangered Species Act, but also if they are rare or commercially valuable. Plaintiffs' interpretation would literally read the word "rare" out of the statute, and therefore cannot be accepted by the Court.

■ For a similar reason, the Court concludes that section 207 protects information about National Park System resources even if those resources are not physically within the boundaries of a unit of the National Park System. Two of the statute's categories, mineral and paleontological objects and objects of cultural patrimony, are limited by the phrase "within units of the National Park System." The third category, "resources", is not.

The Court must presume that Congress acts deliberately when drafting a statute. *See, e.g., Natural Resources Defense Council v. United States Envtl. Protection Agency,* 915 F.2d 1314, 1321 (9th Cir.1990) ("The ordinary presumption is that Congress' drafting of the text is deliberate."). Plaintiffs have presented no evidence from the structure of the statute or the legislative history that would suggest a drafting error. Therefore, Congress must not have intended to restrict the National Park System resources covered by the statute to only those resources actually physically located inside the boundaries of a national park. Nor would such a limitation make sense in light of the inherently mobile character of wildlife, which does not recognize park boundaries. Therefore, the Court concludes that section 207 does protect information about wildlife that may be located outside the boundaries of a national park, if that wildlife bears a close relationship to wildlife in a park.

### 3. Application of Section 207 to Reynolds' Data

■ The Court has now determined that section 207 is an exemption three

statute and that section 207 can encompass Forest Service records about goshawks located outside the boundaries of Grand Canyon National Park. The Court must now turn to the specific information that the government seeks to protect under section 207 in this case.

The National Park Service ("NPS") examined Plaintiffs' request and Reynolds' data in light of section 207. NPS concluded that all of the goshawks on the Kaibab Plateau are part of a single genetic population, and that the continued presence of goshawks in Grand Canyon National Park is dependent on the continued viability of the entire Kaibab Plateau goshawk population. NPS further determined that the goshawk is rare, in that a minimum of 60 breeding pairs are necessary to sustain the goshawk population on the plateau, and Reynolds' research suggests that the plateau currently has no more than 150 breeding pairs. (See Def.'s SOF, Exh. 1.)

NPS therefore concluded that the goshawk is a rare National Park System resource under section 207. NPS further determined that "information concerning the nature and specific location" of the goshawks includes all information that would tend to identify the nesting locations of goshawks with an accuracy of greater than one square mile. Finally, NPS determined that disclosure of location-specific or location-indicative information would create an unreasonable risk of harm to the goshawks. Nesting goshawks are easily disturbed by even well-intentioned observers, and eggs and young goshawks may also be subject to poaching by falconers. (See id.)

Although Plaintiffs object to the Park System's interpretation of section 207, they do not object to the factual basis for any of the findings of the NPS.[6] (See Def.'s SOF; Sep. Statement of Pl.'s in Resp. to Defs.' MSJ.) Nor have Plaintiffs argued that location-specific information about goshawk nests would not be covered by section 207 under Defendants' interpretation of the statute. Defendants' evidence shows that NPS took a reasoned and scientifically supported approach to determining what types of locational information regarding the goshawks falls within section 207. (See Defs.' SOF, Exh. 1.)

Finally, although not a formal rule, the NPS interpretation of the statutory scheme under which it operates remains entitled to considerable deference, so long as the interpretation is not contrary to the meaning of the statute and the intent of Congress. See Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) (observing that agency interpretations, "while not controlling on the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance"); Community Hosp. of Chandler, Inc. v. Sullivan, 963 F.2d 1206, 1209 (9th Cir. 1992). The Court therefore concludes that section 207 does protect from disclosure all information tending to identify the location of goshawk nest-sites within one square mile.

The Court must now apply this determination to the disputed items in Plaintiffs' FOIA request. First, Plaintiffs request "copies of the red squirrel data

---

**6.** Plaintiffs do argue that disclosure of location-specific information to them would not create an unreasonable risk of harm to the goshawks. However, selective disclosure is antithetical to FOIA. For purposes of FOIA, disclosure to one is disclosure to all and the particular characteristics of individuals requesting information may not be considered. See, e.g., Maricopa Audubon Society v. United States Forest Service, 108 F.3d 1082, 1088 (9th Cir.1997).

from the Kaibab Plateau" from 1991–1996. Consistent with the analysis above, squirrel data is subject to withholding only to the extent that it reveals the proximity of nest sites. All red squirrel data that does not relate to specific nest sites must be disclosed.

■ Second, Plaintiffs request "all data collected from the radio-tracking in 1991, 1992 and 1993 from the Kaibab Plateau." Defendants may withhold technical information about the radio-tracking devices, if that information could still be used to locate goshawks. Defendants may also withhold all information regarding nest sites that is accurate to an area of less than one square mile. To the extent data from the radio-tracking study can be redacted to avoid disclosure of this information, Defendants must do so and disclose the redacted version.

■ Third, Plaintiffs request copies of all documents addressing "the telemetry of juvenile goshawks and/or the funding of the radio-tracking of juvenile goshawks." Defendants may withhold only those documents that identify nest locations with an accuracy of greater than one square mile, and must disclose those documents in redacted form where possible.

■ Fourth, Plaintiffs request a "list of every territory by number and nest site on the Kaibab Plateau with the exact corresponding map location." Defendants must disclose this information, although they may redact the specific location of the nest site within each territory.

■ Fifth, Plaintiffs request "copies of information for every nest site known on the Kaibab Plateau that includes not only the nest number and exact nest site location but also the activity recorded by year" from 1991 to 1996. "This information should include documentation of occupancy and productivity of each nest, as well as

the sex of each fledgling." Defendants must disclose this information, although again they may redact the "exact nest site location." Where documents contain information on nest location as well as other relevant information, Defendants must produce them in redacted form.

Because Defendants originally withheld information under exemption five, and not exemption three, Defendants must now re-examine the information they previously withheld and make new disclosures consistent with this Order. With the guidance of the Court's reasoning herein, the parties should be able to resolve most, and perhaps all, of their disputes about Plaintiffs' right of access to the remaining information. After Defendants make their new disclosure, Plaintiffs may petition the Court for *in camera* review of any items that remain in dispute. Defendants are cautioned that they are to redact and withhold no more than absolutely necessary to comply with this Order.

## C. Defendants' Motion to Strike

■ Defendants have filed a motion to strike two newspaper articles submitted by Plaintiffs in response to Defendants' Statement of Facts. Defendants asserted that Reynolds does not oppose the placement of the goshawk on the Endangered Species List. Plaintiffs disagreed, and provided the newspaper articles as evidence that Reynolds has in fact taken the position that the goshawk should not be protected at this time.

The Court will deny the motion to strike as moot. The disputed fact to which the newspaper articles relate, Reynolds' position on protection for the goshawk, is entirely irrelevant to the issues before the Court on Plaintiffs' FOIA request. Plaintiffs and Defendants, including Robin Silver and Richard Reynolds, have a long

history of disagreement over the status of the goshawk. The debate over Reynolds' position and the accuracy of the newspaper articles is part of that history, but has no place in this litigation.

## D. Fees and Costs

Finally, Plaintiffs assert that they are entitled to recover their fees and costs as the prevailing party, because Defendants have already produced most of the information sought by Plaintiffs as a result of this litigation. However, the Court will defer any consideration of Plaintiffs' claim for fees until this action is otherwise concluded.

### CONCLUSION

Defendants' original decision to withhold information from Plaintiffs under FOIA exemption five was in error, with the possible exception of some information relating to the budgeting of the juvenile goshawk radio-tracking study. However, location-specific and location-indicative information regarding goshawk nest sites accurate to an area of less than one square mile is protected from disclosure under NPOMA section 207. Defendants must therefore reexamine the records they originally chose to withhold and make a new disclosure consistent with this Order. Wherever possible, Defendants must redact locational information fro4. m their records and produce the records in redacted form. If, after receiving Defendants' new disclosures, Plaintiffs believe that *in camera* review is still necessary, they may petition the Court. Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment [Doc. No. 30] is granted in part and denied in part;

**IT IS FURTHER ORDERED** that Defendants' Cross–Motion for Summary Judgment [Doc. No. 39] is granted in part and denied in part;

**IT IS FURTHER ORDERED** that FOIA exemption five does not apply to the records sought by Plaintiffs, with the possible exception of records responsive to the third category of information requested by Plaintiffs and containing information relating to budgeting decisions;

**IT IS FURTHER ORDERED** that FOIA exemption three and NPOMA section 207 do apply to the records sought by Plaintiff to the extent that the records contain information regarding goshawk nest locations accurate to an area of less than one square mile;

**IT IS FURTHER ORDERED** that Defendants shall produce to Plaintiffs, in redacted form where necessary and possible, any and all documents previously withheld by Defendants but not exempt from disclosure under this Order within sixty days of the date of this Order;

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike [Doc. No. 54] is denied.