[No. C067081. Third Dist. Mar. 27, 2013.]

THE HUMANE SOCIETY OF THE UNITED STATES, Petitioner, v.
THE SUPERIOR COURT OF YOLO COUNTY, Respondent;
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Real Party in
Interest.

COUNSEL

Evans & Page and Corey A. Evans for Petitioner.

No appearance for Respondent.

Charles F. Robinson, Michael R. Goldstein; Reed Smith and Raymond A. Cardozo for Real Party in Interest.

OPINION

**MURRAY, J.**—This case presents issues concerning the balancing of public interests in research related to an academic study published by a state entity and the disclosure of documents pertaining to prepublication communications and deliberations relating to that study. Pursuant to the California Public Records Act (CPRA) (Gov. Code, § 6250 et seq.),[1] The Humane Society of the United States (HSUS) petitions this court for an extraordinary writ (§ 6259, subd. (c))[2] directing the trial court to order real party in interest, the Regents of the University of California (the Regents), to disclose records relating to the funding, preparation, and publishing of a study by the university's Agricultural Issues Center (AIC) entitled, Economic Effects of Proposed Restrictions on Egg-laying Hen Housing in California (July 2008) (Economic Effects). We issued an alternative writ.

HSUS contends the trial court improperly created a de facto academic "researcher" exemption with a presumption of nondisclosure, unless the party seeking disclosure can prove "improper influence," and made no effort to segregate exempt information from nonexempt information. The Regents ask that we dismiss the petition on the grounds of untimeliness and inadequate record, in addition to opposing disclosure on the merits.

We conclude that the petition is timely and the record is adequate. Based on the evidence presented here, we conclude that the public interests served by not disclosing the records clearly outweigh the public interests served by disclosure of the records. Accordingly, we deny the petition on its merits and discharge the alternative writ.

---

[1] Undesignated statutory references are to the Government Code.

[2] Section 6259, subdivision (c), provides, "an order of the court, either directing disclosure by a public official or supporting the decision of the public official refusing disclosure, is not a final judgment or order within the meaning of Section 904.1 of the Code of Civil Procedure from which an appeal may be taken, but shall be immediately reviewable by petition to the appellate court for the issuance of an extraordinary writ. . . ."

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2008, HSUS requested all records regarding the funding, preparation, release and publication of Economic Effects, published earlier that month by the AIC. Essentially, HSUS sought production of any records and communications concerning the funding, preparation,[3] release and publication[4] of Economic Effects; any records and communications concerning Proposition 2 on the November 4, 2008 ballot, the Prevention of Farm Animal Cruelty Act, which proposed phasing out intensive confinement of egg-laying hens, veal calves, and pregnant pigs on California farms; correspondence or communications with the American Egg Board; and any records of and correspondence concerning university policy on participation in political campaigns by university employees or agents, including correspondence concerning the limitations on such activities.

The Regents' July 30, 2008 response to the HSUS CPRA request, in which the Regents estimated a production date of October 1, 2008, for any nonexempt items, was unsatisfactory to HSUS.

On September 5, 2008, HSUS filed in the trial court a petition for a writ of mandate. (§ 6258.)[5] The petition alleged that the study characterized Proposition 2 as having a negative economic effect on California citizens, and the Regents were stalling disclosure of records until after the election.[6]

After the writ petition was filed, the Regents produced 356[7] pages of documents to HSUS, leaving approximately 3,100 pages still at issue. The

---

[3] HSUS specified that the records related to the preparation of the study it sought included, among other things, a list of everyone who contributed to the study or the press release concerning the study.

[4] HSUS specified that the release and publication records it sought included, among other things, drafts and working copies and any notes, comments or edits made by anyone who reviewed Economic Effects prior to its publication and the press release prior to its publication.

[5] Section 6258 provides, "Any person may institute proceedings for injunctive or declarative relief or writ of mandate in any court of competent jurisdiction to enforce his or her right to inspect or to receive a copy of any public record or class of public records under this chapter. . . ."

[6] The trial court ultimately found that, "Given the breadth of [HSUS's] CPRA requests and the need for coordination amongst various individuals and offices within the University, [the Regents'] response to [HSUS's] request was reasonably prompt." HSUS does not challenge the trial court's conclusions on this issue.

[7] We note a dispute between the parties as to the 356 pages the Regents apparently produced before the October 2010 hearing. The Regents say they produced the documents voluntarily. HSUS suggests these documents were produced pursuant to order of the court in ruling on a motion to compel by HSUS. The trial court's October 2010 order granting and denying in part the petition said, "Shortly after the writ petition was filed, [the Regents] produced 356 pages of documents to [HSUS]. These documents were the subject of a motion to compel, which this Court [previously] decided on May 21, 2010." The petition was filed in September 2008. If the

Regents claimed the withheld pages were exempt from disclosure under three provisions: Government Code section 6255, a "catchall" exemption balancing public interest in disclosure against public interest in nondisclosure; Government Code section 6254, subdivision (a), which provides a balancing test for preliminary drafts or memoranda not retained in the ordinary course of business; and Government Code section 6254, subdivision (k), which relates to documents privileged as "official information" under Evidence Code section 1040. The Regents claimed a public interest in preserving the privacy of documents, asserting exemption under "the deliberative process privilege," the "official information privilege" and "the researcher's privilege."

The Regents divided the withheld documents into four categories: (1) "raw financial data" provided by egg producers to AIC researchers, (2) drafts of the AIC study and prepublication communications between members of the AIC research team, (3) prepublication communications between members of the AIC research team and members of the AIC board of advisors, and (4) communications between members of the AIC research team and outside parties whom the researchers consulted for the study.

In November 2008, the election took place. The ballot pamphlet stated under the "**CON**" argument for Proposition 2: "Proposition 2 is too RISKY. Californians enjoy safe, local, affordable eggs. A UC Davis study says Proposition 2 eliminates California egg production. Instead, our eggs will come from out-of-state and Mexico. Public health experts oppose Proposition 2 because it THREATENS increased human exposure to Salmonella and Bird Flu. Vote No." (Voter Information Guide, Gen. Elec. (Nov. 4, 2008) argument in opposition to Prop. 2, p. 6.) The voters rejected the "**CON**" argument and approved Proposition 2 at the November 2008 election. (Health & Saf. Code, § 25991 et seq., operative Jan. 1, 2015, is the codification of the Prop. 2 initiative.)

The Regents submitted declarations of Daniel A. Sumner, AIC director and agriculture and resource economics professor at the University of California, Davis (UCD).[8] Sumner directed the study and coauthored Economic Effects. In his November 21, 2008 declaration, Sumner described the AIC. The AIC was created by Assembly Resolution No. 8 (1985–1986 Reg. Sess.) in 1985 to research and analyze crucial trends and policy issues affecting agriculture and interlinked natural and human resources. The AIC provides information

Regents produced these documents "shortly" after the filing of the writ petition, it is not clear why the trial court ruled on a motion to compel in May 2010. For purposes of this appeal, it does not matter whether the trial court actually reviewed the 356 pages. As we explain *post*, the record adequately shows the trial court undertook its own review of the 3,100 pages that are the subject of HSUS's petition.

[8] We disregard those portions of Sumner's October 16, 2008 declaration struck by the trial court upon HSUS's evidentiary objections.

through studies, conferences and publications. The AIC's audience includes decision makers in agriculture and government, scholars and students, journalists and the general public.

The AIC operates as a unit of the University of California's (UC) Division of Agriculture and Natural Resources (ANR), a statewide network of UC researchers and educators. It is physically located at the UCD campus. The AIC has a director, several associate directors, professional staff and an advisory board. The advisory board, composed of leaders from the agricultural community and other sectors, helps guide the AIC's agenda, maintain a practical orientation for its programs, and communicate with off-campus audiences. In addition to AIC personnel, AIC projects draw on colleagues from other universities and research institutions, as well as government employees and private industry professionals. Among the positive findings of a five-year review of the AIC by a team of academics and members of the agricultural industry appointed by the ANR is the following: "The Center has an outstanding record of interacting with many facets of the agricultural industry in California and the nation, as well as UC academic and Cooperative Extension programs."

Sumner attested that he has 30 years of experience working in research groups. He has been at UCD since 1993. Before that, Sumner served as the assistant secretary for economics at the United States Department of Agriculture, where he was involved in policy formulation and analysis on a range of topics facing agriculture and rural America. He supervised the department's economics and statistics agencies, and as such, he was responsible for data collection, outlook and economic research. During his academic career, he conducted numerous academic studies. In most cases, he supervised a team of researchers and other staff.

In his October 16, 2008 declaration, Sumner explained that the AIC assured confidentiality to the farmers who provided raw financial data as part of the study upon which Economic Effects was based. Sumner further attested that the study was conducted in the same manner as other academic research in his experience. Sumner went on to describe that process.

"At the University of California, and at AIC in particular, the process of research involves trying new ideas and approaches, investigating lines of thinking that do not work out, suggesting ideas that turn out to be wrong, brainstorming and trying out drafts of explanations that turn out to be far from the final exposition of our approach and results. All of this back and forth happens among a team of project participants and with others who may have information and expertise upon which we can draw. Some of this process is undertaken by junior scholars who are relatively new in their

research careers and serves as a part of the training process for graduate students, postdoctoral scholars and others. [¶] . . . [¶] . . . For the exchange of ideas, information, analysis, manuscript drafts and reviews to be efficient and effective, we communicate informally, often in jargon or short hand. We do not keep detailed records and pay little attention to how we communicate. There is not a consistent record of our exchanges and no clear thread of the process can be reproduced from remaining records. For example, an idea may be proposed in an email, discussed in a hallway conversation and rejected, with no record of why it is no longer pursued. Many, if not most, of these exchanges would make little sense to those outside the process. *That said, for much of what we say and do, it would be easy to misinterpret the communications.* We often provide no details about ideas that are rejected, such as why they were entertained initially and why they were abandoned, for example. Mistakes we make in the process of research can easily be misinterpreted, in hindsight, by those outside the process as negative indicators of the quality of the work or quality of the investigators. In my experience, however, mistakes along the way are part of the research process." (Original italics.)

Sumner further attested that communication with those outside the research team who provide data or critiques raises additional issues. "If collaborators outside our teams expected that any communication with University researchers in general, and AIC specifically, may become part of public record, they would be (rightly, in my opinion) much less forthcoming with frank opinions and potentially confidential data. We often informally solicit information and reviews or analysis from outside sources and they respond informally, in short-hand and sometimes with information of a sensitive nature. To work effectively, we have developed a high degree of trust among industries, policy participants, foundations, and other stakeholders related to the issues we consider. Based on my extensive experience, I am certain that that ability to communicate informally would evaporate if outside individuals and groups expected that any communication with our researchers would be likely to be in the public domain."

Regarding communication between researchers and the AIC board of advisors, Sumner declared: "We communicate regularly and frankly with members of the AIC Board of Advisors. These individuals offer their time and expertise to guide AIC planning activities, in suggesting research topics and suggesting how we can improve our communication with the broad, non-specialist audience. If private informal communications with Board members were, instead, public communications, it would stifle the advising process and convert what is now a simple, direct and informal process into a time-consuming formal activity that would be much less productive and may well defeat the purpose of the process. . . ."

Sumner noted that as a multidisciplinary research unit of the UC, the AIC is charged with "investigating important issues of public interest" and "routinely studies controversial topics." He opined, "[b]ased on my extensive experience, I am certain that the ability of the AIC to fulfill its mission would be significantly hampered if we had to make public our research-team communications (whether it be our internal communications or our communications with those outside the team, such as the AIC Board of Advisors and those on whom we rely for data or other information for our studies)."

In his declaration dated November 29, 2008, Sumner added: "More effective supply of objective analysis free from advocacy that is useful in discussions of public issues is the main reason why the public interest is best served by giving the process of our research the confidentiality it requires. Once our research is published, the scrutiny of peers, policy-makers and other consumers of our published work will give our results and methods the kind of vetting that will ensure our work-product meets the highest standards. [¶] . . . Forcing us to reveal all of our sources, and all of the confidential information they provide us, and releasing every detail of our research communications, in search of bias, will only lead to fewer (if any) sources, and fewer communications, and the work we do, and the benefit we strive to confer on the public, all will suffer. Talking with members of industry and gathering data from industry and other stakeholders is a strong *positive*— indeed, a necessary—part of doing applied relevant research. It is *not* evidence of bias that researchers on relevant topics seek data from entities that have useful information. This is a basic princip[le] of social science and indeed all relevant research . . . ." (Original italics.)

Sumner further attested, "I have been working in research groups for 30 years and, from my personal experience, members of those research groups, including me, have found informal back-and-forth communication extremely valuable. I know this from my personal experience collaborating and from observing the collaboration approaches of my colleagues. As the director of AIC, I know first-hand that our team of researchers uses email to communicate among ourselves and with collaborators all across the state of California and indeed all over the world. For example, I am now collaborating on a research project with co-authors in Korea, Germany, Belgium as well as several at several universities in the United States. My personal experience and judgment is that the quality and quantity of work would be stifled if I were concerned that our informal communications would be made available broadly. [¶] . . . [¶] . . . As to my exchanges with colleagues and those discussing our work, I value frank and direct critiques. . . . I know that the direct comments I have received on the work of my staff would be much more hedged and less clear and direct if those critiques were expected to be public. Furthermore, in my experience, suggestions for improving the research would be less direct and less usefully critical if they were expected to

be public where clear and direct critiques might be misinterpreted as rejecting the value of the work overall. I know from personal experience of participating in open discussion in seminars and public forums and receiving written public comments from colleagues that public communication is more circumspect compared to communication that is expected to be kept private."

Sumner also attested that the Economic Effects study was funded solely by UC funds.

In January 2009, the trial court issued a tentative ruling stating it would review "all" of the withheld documents in camera and require disclosure of records related to HSUS's concern about improper influence.

On April 13, 2009, the trial court appointed a special master to review the withheld documents in camera. In an August 18, 2009 order on the Regents' motion to correct the April 13, 2009 order of reference, the court wrote, "[HSUS] argues that the Court has improperly limited the Special Master's review of the records. [HSUS] also argues that the Court has improperly delegated the task of balancing the relevant interests in disclosure versus non-disclosure to the Special Master. Not so. The Court has relegated a specific set of tasks to the Special Master, upon the completion of which the Special Master will forward all of the records to the Court." (Original underscoring.) In its August 18, 2009 amended order of reference, the trial court explained the special master's duties: "[HSUS] claims that the egg and/or poultry industry improperly influenced the conduct or result of the study . . . . The Special Master shall review *in camera* all documents [being withheld] and group the documents into three stacks: (1) documents showing no influence by the egg and/or poultry industry, (2) documents showing improper influence by the egg and/or poultry industry, and (3) documents showing influence (but not improper influence) by the egg and/or poultry industry. [¶] An egg farmer who provides raw data to a researcher, such as data concerning costs of production, would likely affect or influence the results of a study. An egg farmer who provides a researcher the name of a source for particular data or information about innovations or trends within the industry may also influence a study. None of the above conduct, however, constitutes improper influence. [¶] In contrast, a *quid pro quo* offer is improper influence. An egg farmer's directive that the researcher must interpret the data in a particular manner could constitute improper influence. Additionally, depending upon the particular circumstances, editorial comments by an egg farmer could also constitute improper influence. [¶] A close examination of the facts surrounding the statements made is required to determine whether influence is improper or not. [Fn. omitted.]" (Original underscoring, boldface omitted.)

On April 16, 2010, the special master issued an amended report regarding his review of the documents. He reported that he had reviewed the 3,096 Bates-stamped pages[9] and had determined that (1) no documents showed "improper influence"; (2) some documents showed "influence but not improper influence" (including approximately 89 pages of communications with industry, 64 pages of communications with the AIC board and nine pages of communications among the research team); and (3) all other documents showed "no influence" by the egg and/or poultry industry.

In his amended report, the special master recommended disclosure of documents that showed any influence, not just "improper" influence, and nondisclosure of other documents. In so doing, the special master noted that those documents are not expressly exempt and expressed the opinion that "[the Regents have] not shown that on the facts of this particular case, the public interest served by not disclosing these records clearly outweighs the public interest served by disclosure. [Citation.] On the contrary, these documents provide the underlying basis and rational[e] for the conclusions reached in the AOC 2008 study, and the public interest in transparency would be highly served by disclosure."

In recommending that documents showing "no influence" not be disclosed, the special master stated, "These documents consist of internal communication among University representatives regarding the final work product or study. They do not involve outside influence, but they consist of private internal preliminary discussions, deliberations, drafts and redrafts which should not require disclosure. . . . [B]ecause of the nature of these documents and their questionable relevance, the public interest served by not disclosing them clearly outweighs any interest served by disclosure."

On October 15, 2010, the trial court issued its order granting in part and denying in part HSUS's petition. The trial court ruled that the raw financial data was exempt from disclosure.[10] As to the three categories of communications, the trial court rejected the Regents' invocation of the "deliberative process" exemption, because the Regents "failed to show that the categories of records for which it claims an exemption involve[] the type of decision-making or policy-making involved in the cases respondent cites . . . ." The Regents also failed to demonstrate the existence of a "researcher's privilege" under California law.

---

[9] After an initial report by the special master, the trial court ordered that all documents be Bates-stamped and, if any documents bore Bates-stamping by the Regents, the old numbers were to be distinguished.

[10] HSUS expressly states it does not challenge the trial court's ruling regarding the raw financial data, all of which was obtained pursuant to an express promise of confidentiality.

Nevertheless, the trial court concluded that the interest in protecting academic research is relevant to a balancing of interests under the "catch-all exemption" of section 6255.[11] The court balanced the public interest in encouraging research and the study of important public issues against the public interest in disclosing improper influence over a publicly funded study. "The Court finds that on the facts of this case, except where records show improper influence by the egg and/or poultry industry on the AIC study, the public interest in promoting research and the study of agricultural issues clearly outweighs the public interest served by disclosure of the records at issue [under the catchall exemption]. [¶] After reviewing the records *in camera*, the Court cannot conclude that any of the records at issue show[] improper influence by the egg and/or poultry industry. Rather, where disclosure is ordered herein, the Court found that [the Regents] failed to establish that an exemption applies to a particular document."

Finding no exemption applicable to 28 pages of the documents it reviewed, the trial court ordered disclosure of those documents.[12] The court also ordered disclosure of the names of persons contained in the withheld documents, except the names of egg producers. Rather than compelling the Regents to release all of the documents, redacting all but the names, the court permitted the Regents to release a redacted version of the biographical index, showing just the names. The trial court denied disclosure of several documents that did not fall within the scope of the request. The court denied disclosure of all other documents as exempt from disclosure under the catchall exemption (Gov. Code, § 6255) and/or the equivalent official information privilege (Gov. Code, § 6254, subd. (k);[13] Evid. Code, § 1040).[14]

---

[11] Section 6255, subdivision (a), provides, "The agency shall justify withholding any record by demonstrating that the record in question is exempt under express provisions of this chapter or that on *the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record.*" (Italics added.)

[12] The court ordered redaction of a cellular phone number and an e-mail in the 28 disclosed pages.

[13] Section 6254, subdivision (k), makes exempt "[r]ecords, the disclosure of which is exempted or prohibited pursuant to federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege."

[14] Evidence Code section 1040 states, "[a] public entity has a privilege to refuse to disclose official information," i.e., "information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made," if "[d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . . In determining whether disclosure of the information is against the public interest, the interest of the public entity as a party in the outcome of the proceeding may not be considered."

In January 2011, HSUS filed in this court its petition for an extraordinary writ of mandate. We issued an alternative writ of mandate in March 2011. The Regents filed a return answering and opposing the writ petition.[15]

## DISCUSSION

### I. Procedural Issues

We first discuss and reject the Regents' procedural arguments that the petition is untimely and the record is inadequate for review.

### A. Timeliness

■ Section 6259, subdivision (c), limits the time for seeking appellate review of a trial court's CPRA ruling. "[A] party shall, in order to obtain review of the order, file a petition within 20 days after service upon him or her of a written notice of entry of the order, or within such further time not exceeding an additional 20 days as the trial court may for good cause allow. . . ." Service by overnight delivery extends the time by two court days. (Code Civ. Proc., § 1013, subd. (c).) (Fn. 17, *post.*)

Here, service was by overnight delivery after the trial court had given HSUS an extra 20 days to file the petition. Thus, HSUS had 42 days after service of the notice of entry of the trial court's order within which to file its petition. (The issue presented here relates to the Regents' service of the notice of entry as the trigger for beginning the filing period.)

The Regents argue HSUS's own petition admits untimeliness, because it said service occurred on November 29, 2010, which means the deadline was Monday, January 10, 2011, and HSUS's petition filed January 11 was one day late, depriving this court of jurisdiction.[16] HSUS replies it does not admit service on November 29 but used that date to streamline events for us, despite defective service.

The record shows the order issued on October 15, 2010. The Regents' initial proof of service was undated and claimed the Regents served notice of entry of order by overnight delivery, "collected for delivery by the authorized

---

[15] The Regents' return adds factual allegations about extraneous matters, such as their good faith efforts to comply with the CPRA, which we need not address.

[16] The Regents offer no authority directly on point concerning the jurisdictional nature of the time trigger and HSUS does not dispute this assertion. Consequently, we will assume for the sake of argument that section 6259's time limit is jurisdictional. (*People v. Superior Court (Brent)* (1992) 2 Cal.App.4th 675, 683 [3 Cal.Rptr.2d 375] [where a statute sets a specific time limit to file a writ petition, courts have held the time limit to be jurisdictional].)

Fed Ex courier at my place of business" on "December 3, 2007"—three years *before* the order issued. HSUS's counsel notified the Regents of the defective service and said, "I normally wouldn't make a big deal about it, but I didn't get the Fedex [*sic*] until December 2nd and there was no dated proof of service, so it put me behind." On December 9, 2010, the Regents faxed a "corrected proof of service" to HSUS despite the absence of a written agreement for service by facsimile as required by Code of Civil Procedure section 1013, subdivision (e), which states in pertinent part, "Service by facsimile transmission shall be permitted only where the parties agree and a written confirmation of that agreement is made. . . ."

The Regents' "corrected proof of service" stated: "On November 24, 2010, I [(Barbara Bray)] served the attached Notice of Entry of Order by placing a copy thereof in a separate envelope designated by the FedEx carrier with delivery fees provided for thereon for next day delivery, addressed [to the office of HSUS's attorney]. [¶] Following ordinary business practices in our office, the envelope was sealed and placed for collection by FedEx at our office's designated pick-up location on this date, and would, in the ordinary course of business, be retrieved by FedEx for overnight delivery on this date. On December 9, 2010, I learned from FedEx, for the first time, that the FedEx delivery person missed our floor on November 24, 2010, and did not pick up this, and several other scheduled packages. I am informed by FedEx, and on that basis believe, that this package was not picked up by FedEx until November 29, 2010." (Boldface omitted.)

HSUS responded that there was no written agreement for service by facsimile, and the corrected proof of service was defective because it contained hearsay and showed the package was neither hand delivered nor deposited at a facility maintained by FedEx, as required by Code of Civil Procedure section 1013.[17] HSUS's attorney said, "The entire reason I told you about the prior messed up proof of service (showing the 2007 date) is that I'm trying to eliminate any problems/confusion with the service and get a solid, proper, proof of service accomplished. I feel like this amendment doesn't fix the problem, but adds a new layer of confusion." The Regents did nothing.

---

[17] Code of Civil Procedure section 1013, subdivision (c), states in pertinent part: "In case of service by [a] method of delivery providing for overnight delivery [other than United States Postal Service Express Mail], the notice or other paper *must be deposited in a box or other facility regularly maintained by the express service carrier, or delivered to an authorized courier or driver* authorized by the express service carrier to receive documents . . . . Service is complete at the time of the deposit, but [subject to specified exceptions] any period of notice and any right or duty to do any act or make any response within any period or on a date certain after service of the document served by Express Mail or other method of delivery providing for overnight delivery shall be extended by two court days. . . ." (Italics added.)

We do not view HSUS's filing in this court as a judicial admission of the date of service. Contrary to the Regents' insinuation in their opposition briefing that HSUS "admitted" the November 29 date in a "verified" pleading, the date was not in the verified petition. It was only in the unsworn memorandum of points and authorities prepared by counsel, and the Regents expressly acknowledge as much in their supplemental opposition. A judicial admission is an unequivocal concession of the truth of a matter and may be made in a pleading. (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 746 [100 Cal.Rptr.3d 658]; *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 48 [43 Cal.Rptr.3d 874].) However, "[n]ot every document filed by a party constitutes a pleading from which a judicial admission may be extracted." (*Myers, supra*, at p. 746; accord, *Estate of Nicholas* (1986) 177 Cal.App.3d 1071, 1090 [223 Cal.Rptr. 410] [information in unsworn memoranda of points and authorities did not constitute evidence].)

Based on the history of the dispute, including HSUS's objection to the facsimile transmission as proof of service, it is clear HSUS, believing timeliness was not an issue, was willing to overlook the service defects. We conclude HSUS has not conceded service on November 29.

We also decline to use the Regents' corrected proof of service to fix the date triggering the filing period, because it was defective and contains hearsay. The Regents sent the corrected proof of service by facsimile despite the absence of a *written* agreement, as required by Code of Civil Procedure section 1013, subdivision (e). Thus, the service was defective on this ground alone.

Overlooking the facsimile service requirement, the Regents cite case law for the proposition that defects in proof of service are inconsequential, but the cited cases are inapposite. *Palmer v. GTE California, Inc.* (2003) 30 Cal.4th 1265 [135 Cal.Rptr.2d 654, 70 P.3d 1067], cited by the Regents, held the statutory requirement of serving notice of entry of judgment is satisfied by timely serving a copy of the file-stamped judgment. (*Id.* at p. 1267.) The court in *Palmer* said that, to start the time within which to file a motion for new trial or a judgment notwithstanding the verdict, it is not necessary to serve a separate document entitled " 'notice of entry of judgment.' " (*Id.* at pp. 1267–1268.) However the court noted that a proof of service accompanied the conformed copy of the judgment. (*Id.* at p. 1268.) The proof of service was not the issue in *Palmer*. The issue and holding in *Palmer* is not analogous here.

The Regents also cite *Katelaris v. County of Orange* (2001) 92 Cal.App.4th 1211 [112 Cal.Rptr.2d 556], in which the court held proof of service of the rejection of a tort claim did not require personal knowledge and was

sufficient if the declarant attested to the business practice for collecting and processing outgoing mail. (*Id.* at p. 1216.) Here, however, it is undisputed that the business practice did *not* work as it was supposed to work. Moreover, *Katelaris* dealt with Code of Civil Procedure section 1013a, proof of service *by mail*, which expressly states in subdivision (3) that the proof of service may be based on the affiant's averment of familiarity with the business's practice for collecting and processing mail with the United States Postal Service, and an averment that the affiant followed that practice. There is no statutory analogue for overnight delivery services.

The Regents also rely on *In re Marriage of Eben-King & King* (2000) 80 Cal.App.4th 92 [95 Cal.Rptr.2d 113], in which the court held that a typographical error on the notice of entry of judgment was inconsequential where the party did not bring the matter to the attention of opposing counsel or the court. (*Id.* at pp. 114–115.) Here, HSUS *did* bring the defects to the Regents' attention.

Finally, the Regents cite *National Advertising Co. v. City of Rohnert Park* (1984) 160 Cal.App.3d 614 [206 Cal.Rptr. 696], in which the court held an affidavit attesting to hand delivery to the person in charge of opposing counsel's office sufficed, where the appellants did not dispute the accuracy but argued the record failed to show the person was counsel's agent. (*Id.* at pp. 618–619.) No such showing was required. (*Ibid.*) Again, this case is not analogous. Here, there was no hand delivery and accuracy of the proof of service is disputed.

■ We note also that even if the notice was served on November 29 as indicated in the December 9, 2010 "Corrected Notice of Entry of Order," the Regents' service did not comply with Code of Civil Procedure section 1013, subdivision (c). Service by overnight delivery is valid under that provision only when the document is: (1) "deposited in a box or other facility regularly maintained by the express service carrier" or (2) "delivered to an authorized courier or driver." The Regents stated in their corrected notice that the envelope containing the notice was placed "at our office's designated pick-up location" for FedEx. The Regents contend this complied because what was done "establishes both placement in a 'facility regularly maintained by the express service carrier' and delivery 'to an authorized courier or driver.' " (Italics omitted.) We disagree.

■ When interpreting the words of a statute, we apply the usual and ordinary meaning to those words. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906]; *Trope v. Katz* (1995) 11 Cal.4th 274, 280 [45 Cal.Rptr.2d 241, 902 P.2d 259].) In doing so, we conclude that the designated pickup location in the Regents' office, based on the evidence

presented, is not a box or facility regularly maintained by the express service. ■ The dictionary is a proper source to determine the usual and ordinary meaning of words in a statute. (*E. W. Bliss Co. v. Superior Court* (1989) 210 Cal.App.3d 1254, 1258, fn. 2, 4th par. [258 Cal.Rptr. 783].) As pertinent here, ■ Webster's Dictionary defines the word "maintain" as "to keep in an existing state," and defines "facility" as "something . . . that is built, installed, or established to serve a particular purpose." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) pp. 749, 447.) The statutory language expressly states that facility must be regularly maintained by the express service carrier, not the customer of the carrier. The same applies to the alternative of depositing the document in a box. The box must be maintained by the carrier. Nothing in the evidence indicates that FedEx regularly maintained a box or facility in the Regents' office.

Nor can we conclude the notice was "delivered to" the FedEx carrier. To do so would require that we accept the hearsay statement indicating that the carrier actually picked up the envelope. The Regents offer no theory on how we can accept as true the hearsay statements of some unnamed representative of FedEx, and we see none. We agree with HSUS. We must disregard the hearsay statements contained in the corrected notice. (See *In re Behymer* (1933) 130 Cal.App. 200, 203–204 [19 P.2d 829] [affidavit for publication of summons was invalid because it contained hearsay statements establishing diligence].)[18]

We conclude HSUS's petition is timely.

## B. Adequacy of the Record

The Regents argue HSUS failed to provide a record adequate for review because the record does not contain transcripts of the "approximately ten hearings" or the "approximately 40 briefs" filed in the trial court. We conclude the absence of these items does not preclude review here.

California Rules of Court, rule 8.486(b) says: "(1) A petition that seeks review of a trial court ruling must be accompanied by an adequate record, including copies of: [¶] . . . [¶] (D) A reporter's transcript of the oral proceedings that resulted in the ruling under review. [¶] . . . [¶] (3) If a transcript under (1)(D) is unavailable, the record must include a declaration by counsel or, if the petitioner is unrepresented, the petitioner: [¶] (A)

---

[18] For the same reason, we disregard the hearsay contents of a copy of a FedEx e-mailed tracking update submitted by the Regents in their supplemental opposition, which purportedly shows pickup on November 29, 2010, and delivery on November 30, 2010. Indeed, the document plainly states, "FedEx does not . . . guarantee or warrant . . . the accuracy of this tracking update."

Explaining why the transcript is unavailable and *fairly summarizing the proceedings, including the parties' arguments* and any statement by the court supporting its ruling. . . ." (Italics added; undesignated rule references are to the California Rules of Court.) Rule 8.486(b)(1)(B) provides that the petition must be accompanied by "[a]ll documents and exhibits submitted to the trial court supporting and opposing the petitioner's position."

Here, as the Regents point out, the record does not include briefs HSUS may have filed in the trial court. HSUS's attorney did submit a declaration which did not explain the absence of transcripts[19] but attested the petition for review relates to the hearing that took place on October 7, 2010, at which he was present. Counsel summarized that hearing: "I objected to every instance where Judge Reed denied disclosure [in his tentative ruling, which is part of the record on review], and further objected to Judge Reed's use of the term 'improper influence.' Judge Reed was unpersuaded [*sic*] by my arguments and asked what term I would use. I responded that [HSUS] should not be forced to meet any burden of demonstrating a form of 'influence,' since under the CPRA the records are presumed disclosable and the burden should be on the public agency. I further argued that if Judge Reed was planning on adopting his tentative ruling, at a minimum he should release all the names and email headers on the documents because they have nothing to do with promoting research. Judge Reed agreed to release the names from the records, and allowed The Regents to provide an index with the names that appear in the documents, instead of requiring The Regents to redact all information from the documents but the names. I further objected to Judge Reed's tentative on the basis that he developed the 'improper influence' standard not based on the content of the documents, but on general policies, and then he looked at the documents to see if the 'improper influence' standard was met; instead of engaging in the public interest balancing based on the actual content of each document. Judge Reed did not agree with my argument."

The Regents take issue with the summary provided by HSUS's counsel, arguing the trial court did properly examine each document, as reflected in the trial court's order stating, "Applying the above findings and conclusions to *each* document [the Regents] withheld from disclosure and *after careful review of the documents* and considering the parties' arguments, the competent evidence submitted in support thereof, the Special Master's amended report, and whether any reasonably segregable portion of a document should be disclosed, the Court orders . . . ." (Italics added.)

---

[19] Based on what was said at oral argument, we understand that neither side arranged for a court reporter. Counsel who decide to forgo the services of a court reporter create an imperfect record for appellate review.

To be sure, HSUS counsel's rule 8.486(b)(3)(A) summary is deficient. But the deficiencies inure to the benefit of the Regents. For example, we actually find HSUS's summary helpful to the Regents, because it shows HSUS mischaracterizes what the court did. Counsel for HSUS admits "Judge Reed did not agree" with HSUS's view that the trial court developed the "improper influence" standard and then looked at the documents to see if they met the standard, rather than balancing public interest based on the content of each document.

The Regents argue HSUS omits other trial court documents, "such as some of the declarations that were presented to the trial court," and the court's earlier rulings. However, the Regents append earlier rulings and declarations to the preliminary opposition they filed in this court, and they fail to state whose declarations are missing or why it matters.

■ Despite the rule requirements, we have the discretion to decide the petition on its merits. (See rule 8.486(b)(4) [the court *may* summarily deny the petition]; see also *Fuss v. Superior Court* (1991) 228 Cal.App.3d 556, 559 [279 Cal.Rptr. 46] [court exercised its discretion to decide the petition on the merits in light of the novelty of and public interest in the issue presented].) And we conclude the record, while imperfect, is adequate for our review, with two qualifications. First, HSUS cannot support its contention that the trial court never defined "improper influence"—a contention undermined by the Regents' verified response that there was a lengthy colloquy on the definition at the October 7, 2010 hearing and the fact that the court had previously given examples of what might constitute "improper influence" in its August 18, 2009 amended order of reference. Second, HSUS will have to live with the summary of its arguments in the trial court as set forth in counsel's rule 8.486(b)(3)(A) summary. As we discuss *post*, points HSUS now makes concerning various public interests not shown in counsel's summary or elsewhere in the record as having been asserted in the trial court are forfeited.

## II. Standard of Review

HSUS contends that we should review de novo the trial court's balancing of interests, which it contends was based on the trial court's creation of an "erroneous 'improper influence' standard." HSUS further asserts that the trial court's "findings" regarding improper influence are "irrelevant."

"In analyzing the availability of [the CPRA's catchall exemption under section 6255 (fn. 11, *ante*)], we accept the trial court's express and implied factual determinations if supported by the record, but we undertake the weighing process anew. [Citation.] . . . '[A]lthough a reviewing court should

weigh the competing public interest factors de novo, it should accept as true the trial court's findings of the "facts of the particular case" [citation], assuming those findings are supported by substantial evidence.' [Citation.]" (*County of Santa Clara v. Superior Court* (2009) 170 Cal.App.4th 1301, 1323 [89 Cal.Rptr.3d 374] (*County of Santa Clara*).)

## III. CPRA Legal Principles

■ "In enacting [the CPRA], the Legislature, mindful of the right of individuals to privacy, finds and declares that access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." (§ 6250.) The CPRA, which was modeled after the federal Freedom of Information Act (5 U.S.C. § 552 et seq.; hereafter FOIA), ensures public access to vital information about the government's conduct of its business. (*City of San Jose v. Superior Court* (1999) 74 Cal.App.4th 1008, 1016 [88 Cal.Rptr.2d 552] (*City of San Jose*).) The people's right of access to public records is enshrined in the California Constitution, article I, section 3, subdivision (b)(1) ("The people have the right of access to information concerning the conduct of the people's business . . . ."). (*International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 329 [64 Cal.Rptr.3d 693, 165 P.3d 488] (*International Federation*).) The " ' "people's right to know" ' " demands public exposure of recorded governmental action. (*Sacramento County Employees' Retirement System v. Superior Court* (2011) 195 Cal.App.4th 440, 446, 453–454 [125 Cal.Rptr.3d 655] (*SCERS*).)

Yet, the people's right to know is not absolute. The CPRA provides for specific exemptions (§ 6254)[20] and a "catch-all exemption" (see § 6255; fn. 11, *ante*). The exemptions are to be construed narrowly. (*SCERS, supra,* 195 Cal.App.4th at p. 453; *California First Amendment Coalition v. Superior Court* (1998) 67 Cal.App.4th 159, 167 [78 Cal.Rptr.2d 847] (*California First Amendment Coalition*).) The CPRA does not have an express exemption for

---

[20] For example, section 6254 specifically exempts research and deliberative processes for specified records involving employer/employee relations (§ 6254, subd. (p)), Medi-Cal (§ 6254, subd. (q)), the Managed Risk Medical Insurance Board (§ 6254, subds. (v), (w), (y)), and the State Compensation Insurance Fund (§ 6254, subd. (ad)).

general academic research.[21] It is the application of the catchall exemption set forth in section 6255 that is at issue here.[22]

■ The burden of proof as to the application of an exemption is on the proponent of nondisclosure, who must demonstrate "that on the facts of the particular case the public interest served by not disclosing the record *clearly outweighs* the public interest served by disclosure of the record." (§ 6255, italics added.) In other words, the proponent of nondisclosure must establish a "clear overbalance" on the side of nondisclosure. (*Michaelis, Montanari & Johnson v. Superior Court* (2006) 38 Cal.4th 1065, 1071 [44 Cal.Rptr.3d 663, 136 P.3d 194]; see *City of San Jose, supra*, 74 Cal.App.4th at pp. 1018–1019.)

■ As the court in *City of San Jose* noted, ". . . California courts apply the section 6255 balancing test for the catchall exception on a case-by-case basis. Where the public interest in disclosure of the records is not outweighed by the public interest in nondisclosure, courts will direct the government to disclose the requested information. (See *CBS, supra*, 42 Cal.3d at pp. 656–657 [names, home addresses and applications of persons who obtained concealed weapons permits must be disclosed]; *New York Times Co. v. Superior Court* (1990) 218 Cal.App.3d 1579, 1585–1586 [268 Cal.Rptr. 21] [disclosure of names and addresses of excessive water users ordered] . . . . [¶] Conversely, courts have upheld the government's refusal to release public records when the public interest in nondisclosure clearly outweighed the public interest in disclosure. (. . . *Times Mirror*[ *Co. v. Superior Court* (1991)] 53 Cal.3d [1325,] 1345–1346 [283 Cal.Rptr. 893, 813 P.2d 240] [Governor's appointment schedules and calendars properly withheld to protect public interest in decisionmaking process and governor's security]; *Wilson v. Superior Court*[ (1996)] 51 Cal.App.4th [1136,] 1141 [59 Cal.Rptr.2d 537] [no disclosure of applications for appointment to county board of supervisors due to chilling effect on applications and negative impact on decisionmaking process].)" (*City of San Jose, supra*, 74 Cal.App.4th at pp. 1018–1019, citations omitted.)

---

[21] We note Indiana's statute expressly exempts "Information concerning research, including actual research documents, conducted under the auspices of a state educational institution, including information: [¶] (A) concerning any negotiations made with respect to the research; and [¶] (B) received from another party involved in the research." (Ind. Code § 5-14-3-4(a)(6); see *Robinson v. Indiana University* (Ind.Ct.App. 1995) 659 N.E.2d 153 [university records on animal use in research projects was research information exempt from disclosure].)

[22] Although the trial court ruled under both the catchall exemption (Gov. Code, § 6255) and the official information privilege (*id.*, § 6254, subd. (k) [records protected by Evid. Code privilege]; Evid. Code, § 1040 [official information privilege]), the balancing tests are the same (*CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 656 [230 Cal.Rptr. 362, 725 P.2d 470] (*CBS*); *American Civil Liberties Union Foundation v. Deukmejian* (1982) 32 Cal.3d 440, 446, fn. 6 [186 Cal.Rptr. 235, 651 P.2d 822] (*ACLU*)). Consequently, as suggested by HSUS, we analyze the issues herein under the catchall exemption in Government Code section 6255.

In *City of San Jose*, the court held the city did not have to disclose the names, addresses, and telephone numbers of persons who complained about municipal airport noise. It could be fairly inferred, based on human experience, that disclosure of the information would have a chilling effect on future complaints with minimal benefit to the public. (*City of San Jose, supra*, 74 Cal.App.4th at pp. 1022–1024.) Disclosure would subject complainants to direct contact by the media and by persons wishing to discourage complaints. (*Id.* at p. 1024.) "It also may be presumed" that a reduction in complaints would impede the city's ability to comply with its airport noise monitoring duties. (*Ibid.*) The public interest in disclosure of personal information was minimal, because the city had made available all other information in the complaints (date, time, nature of complaint, and location where the complaint originated). (*Ibid.*)

## IV. Evidentiary Objections

Before addressing the merits, we must first address objections related to evidence the trial court considered in the balancing analysis. HSUS contends the trial court, which granted in part HSUS's motion to strike portions of Sumner's October 16, 2008 declaration, erred in denying HSUS's motion to strike other portions of the declaration.[23] HSUS argues, without specificity, that the declaration was based on speculative harm, a guess about third parties' actions, harm to the public agency, and general complaints that the CPRA is a burden on all public agents. We conclude HSUS fails to show error.[24]

HSUS essentially complains Sumner merely "speculated" that disclosure would make it harder for the AIC to gather information for future studies. We do not view Sumner's statements as "speculation," but rather as admissible expert opinion grounded upon his 30 years of experience as a governmental and academic researcher. It is axiomatic that a witness qualified to testify as an expert may offer an opinion related to a subject that "is sufficiently beyond common experience that the opinion . . . would assist the trier of fact" (Evid. Code, § 801, subd. (a)), and is "[b]ased on matter (including his [or her] special knowledge, skill, experience, training, and education) perceived by or personally known to the witness . . . whether or not admissible, that is of a

---

[23] HSUS erroneously cites this declaration as dated October 17. We note that the record does not contain a motion to strike related to Sumner's November 21, 2008 declaration.

[24] We have before us the trial court's order granting in part and denying in part the petition. HSUS refers us instead to the trial court's tentative ruling on the motion to strike, with an unfulfilled promise to provide this court with a formal amended order correcting some unspecified clerical error in the court's order. HSUS has not augmented the record on appeal.

Nor does HSUS direct our attention to its motion to strike anywhere in the record on appeal. We nevertheless address the evidentiary challenges on the merits.

type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his [or her] testimony relates . . . ." (Evid. Code, § 801, subd. (b); see *People v. Eubanks* (2011) 53 Cal.4th 110, 140 [134 Cal.Rptr.3d 795, 266 P.3d 301] (*Eubanks*) [where expert has sufficient knowledge to allow his opinion to go to the jury, question of degree of knowledge goes to weight, not admissibility of evidence]; *Bell v. Mason* (2011) 194 Cal.App.4th 1102, 1112–1113 [125 Cal.Rptr.3d 229] [expert witness may base opinion on reliable hearsay]; *People v. Sundlee* (1977) 70 Cal.App.3d 477, 484–485 [138 Cal.Rptr. 834] (*Sundlee*) [strength of expert's assumptions affects the weight rather than the admissibility of his opinion]; accord, *People v. Fulcher* (2006) 136 Cal.App.4th 41, 54 [38 Cal.Rptr.3d 702] (*Fulcher*) [objections to expert opinion grounded on validity of expert's factual assumptions goes to the weight, not the admissibility of, the opinion].)

HSUS relies on an Attorney General opinion (81 Ops.Cal.Atty.Gen. 383 (1998)) that says speculation is not a basis for denying disclosure. As reflected in that opinion, the Attorney General was asked whether senior citizens' claims for parcel tax exemptions levied by a school district are subject to public inspection. Balancing the interests, the Attorney General concluded that the claims must be disclosed. Regarding the interests on the nondisclosure side of the balance, the Attorney General observed, "if the information in question is not disclosed, the rights of privacy of the senior citizens in the district would be protected. Arguably, they would not be subject to unwanted solicitations directed to them due solely to their having surpassed the age of 65. Such speculation, however, is not a basis for denying disclosure under the terms of section 6255." (81 Ops.Cal.Atty.Gen., *supra*, at p. 387.) Thus, the privacy concern noted by the Attorney General was nothing more than an unsubstantiated fear, not supported by evidence.

The two cases upon which the Attorney General relied involved similar privacy concerns that also were not supported by evidence. In *CBS*, the court held that the catchall exemption of the CPRA did not apply, rejecting the notion that the vulnerability of gun licensees would be increased if their concealed weapons permit applications were made available to the public and concluding that such concerns were merely "conjectural at best." (*CBS, supra*, 42 Cal.3d at p. 652; see *id.* at p. 649.) In *New York Times Co. v. Superior Court* (1990) 218 Cal.App.3d 1579 [268 Cal.Rptr. 21] (*New York Times Co.*), the court held that the catchall exemption did not apply to a request for the names and addresses of water customers who exceeded their water rationing allocation. The water district had asserted that publication of the names could expose the individuals to verbal or physical harassment. (*New York Times Co., supra*, 218 Cal.App.3d at p. 1581.) Quoting *CBS*, the court observed, " '[a] mere assertion of possible endangerment does not "clearly outweigh" the public interest in access to these records.' " (*New York Times Co., supra*, 218 Cal.App.3d at p. 1585.) The court reasoned, "the record contains no evidence

that revelation of names and addresses of those who have exceeded their water allocation during a billing period will subject those individuals to infamy, opprobrium, or physical assault." (*Id.* at p. 1586.)

*California State University, Fresno Assn., Inc. v. Superior Court* (2001) 90 Cal.App.4th 810 [108 Cal.Rptr.2d 870] (*CSU, Fresno*), a case cited by HSUS, is also inapposite. There, the court compelled the university to disclose documents containing the identities of donors who, upon making donations to a university-affiliated foundation, obtained licenses to use luxury suites in a new campus arena. The court reasoned that the university's arguments for nondisclosure were speculative and not supported by competent evidence. "[A]ny claims by the University that donations will be canceled are speculative, supported only by inadmissible hearsay. Statements by University personnel that disclosure of the licensees will 'likely' have a chilling effect on future donations, resulting in a 'potential' loss of donations, are inadequate to demonstrate any significant public interest in nondisclosure. . . . [¶] . . . There is no admissible evidence in the record that any license agreements will be canceled if licensee names are disclosed to the public. Any genuine concerns of donor withdrawals should have been presented with competent evidence . . . ." (*CSU, Fresno, supra*, 90 Cal.App.4th at p. 835; see *id.* at p. 834.)

Here, in contrast to *CBS, New York Times Co.*, and *CSU, Fresno*, there is competent evidence. That evidence is Sumner's expert opinion, which is grounded in his extensive experience in academic research. Consequently, we disagree with HSUS's assertion that Sumner's statements amount to the "exact speculation" found insufficient in *CSU, Fresno*. It was not speculation for a person of Sumner's credentials, with 30 years of research experience, to declare that academic researchers communicate informally, often in jargon or shorthand, trying new ideas, investigating lines of thinking that do not work out, suggesting ideas that turn out to be wrong, and brainstorming in informal ways open to misinterpretation. Furthermore, based on Sumner's experience and his description of the process, it is not speculation for him to opine that disclosure of communications would fundamentally impair the academic research process for the AIC. Similarly, it was not speculative for Sumner to attest that the advisory board and persons outside the research team provide data, advice, and/or critiques informally, in shorthand and sometimes with information of a sensitive nature. And, given Sumner's experience, it is not speculation for him to opine that, if these persons expected their communications to be public, they would be less forthcoming with data and frank opinions. The trial court was well within its discretion as the evidentiary gatekeeper to overrule HSUS's objection to this evidence (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771–772 [149 Cal.Rptr.3d 614, 288 P.3d 1237]) and consider this evidence in its section 6255 balancing analysis.

While Sumner's opinion of the chilling effect prepublication communication disclosure would have in the academic setting is admissible expert opinion evidence because the academic research process is not common knowledge, the chilling effect he describes is consistent with commonly understood general human behavior. This common understanding was discussed by this court in *California First Amendment Coalition*. "[T]he facts which drive our legal conclusions are not adjudicative but legislative in character. 'Legislative facts' refer to the basic generalized knowledge that a fact finder possesses regarding human affairs, and the way the world works. [Citations.] Thus, . . . our perception that 'those who expect public dissemination of their remarks may well temper candor with a concern for appearance,' is based on 'human experience' and not testimony of [witnesses] admitted at trial. [Citation.]" (*California First Amendment Coalition, supra*, 67 Cal.App.4th at p. 174.) In *California First Amendment Coalition*, this court held that applications for appointment to a vacant county supervisor position were exempt from disclosure under the section 6255 balancing test. On the nondisclosure side of the scale was the commonsense conclusion that worthy prospects might forgo the process or applicants might be less forthright about their own shortcomings in response to the questions on the application, if they know their responses will be public. (*California First Amendment Coalition, supra*, at p. 172.) While the public has a strong interest in disclosure once the governor decides who to appoint, the public does not have such a strong interest in unsuccessful applicants. (*Id.* at pp. 173–174.) Though that case involved the deliberative process privilege, the balancing of interests applies here. We reject HSUS's contention that section 6255's balancing test should not afford weight to the importance of the prepublication deliberative process in the academic research context just because the deliberative process privilege applicable to government policymaking decisions is not applicable here.

Contending that Sumner is "only legally able to speak for himself in his declaration," HSUS implies it was necessary for the Regents to submit declarations from all the researchers involved in the Economic Effects study. We disagree. Additional declarations by other researchers would affect only the weight of the opinions offered by Sumner, not their admissibility. (See *Eubanks, supra*, 53 Cal.4th at p. 140; *Sundlee, supra*, 70 Cal.App.3d at pp. 484–485; accord, *Fulcher, supra*, 136 Cal.App.4th at p. 54.)

HSUS argues Sumner's claims about promises of confidentiality are irrelevant because they related only to providers of raw financial data, and HSUS does not challenge the ruling regarding that data. HSUS nevertheless goes on to argue that courts have held promises of confidentiality are insufficient to deny CPRA disclosure. We need not address these arguments, because we do not base our decision on promises of confidentiality.

Under the same subheading challenging Sumner's declaration on evidentiary grounds, HSUS cites an Alaska case which stated the strong public interest in open government justifies the potential chilling of free speech. (*Doe v. Alaska Superior Court* (Alaska 1986) 721 P.2d 617.) In *Doe*, an obstetrician was under consideration for gubernatorial appointment to the State Medical Review Board. (*Doe, supra,* 721 P.2d at pp. 618–619.) Members of a right-to-life group opposing the appointment had sent letters and telegrams protesting the proposed appointment. The obstetrician was not selected. She and other doctors sued the group for libel and sought the governor's appointment file, which included the appointment letters. (*Id.* at p. 619.) The court held that the letters in the governor's appointment file were discoverable, although internal memoranda were protected by executive privilege if they contained advisory opinions and recommendations. (*Id.* at pp. 621–626.) The court rejected the contention that disclosure of the letters would have a chilling effect on petitioner's free speech rights, stating, "We . . . reject petitioner's contention that the speech clause requires that such letters remain confidential because of the chilling effect disclosure may have on citizens' exercise of their free speech rights. Both state and federal courts have recognized that the strong public interest in open government and an election process free of taint justifies certain restrictions on free speech. Thus, laws requiring disclosure of campaign contributions, reporting requirements for lobbyists, conflict-of-interest reports by public officials, and open public meetings have been upheld despite the potential to chill speech." (*Doe, supra,* at p. 629.) This case is of no help to HSUS. Indeed, if sought under the CPRA, the correspondence sought in the Alaska case would have been exempt as "[c]orrespondence of and to the Governor or employees of the Governor's office." (§ 6254, subd. (*l*).) And in any event, the case has nothing to do with the admissibility of Sumner's expert opinions.

HSUS fails to persuade us to disregard any portions of Sumner's declarations, other than those stricken by the trial court.

We now turn to HSUS's arguments on the merits.

## V. The Trial Court's Balancing of the Interests

### A. Purported Categorical Exemption

HSUS makes a number of related arguments regarding the trial court's section 6255 balancing analysis. HSUS argues that although the trial court acknowledged there is no academic research exemption in California, it effectively adopted the Regents' argument for a categorical exemption for all research-related documents concerning agricultural issues unless the person

making the request proved "improper influence"; thus, the trial court improperly shifted the burden. HSUS further argues the trial court improperly looked at the documents only to determine whether they contained evidence of "improper influence" without first applying the section 6255 balancing test to each document. HSUS argues categorical exemptions are improper when they are a substitute for a document-by-document review to determine if the content of the specific document actually supports the agency's proffered public interest in nondisclosure under the catchall exemption. HSUS complains Sumner's declarations spoke of academic research generally rather than specific documents in this particular study. HSUS argues the trial court engaged in a "backward analysis" under the section 6255 balancing test, in that the court never reviewed the documents to weigh public interest in nondisclosure based on the *actual content* of each document, but instead *presumed* all information was confidential as academic research and looked only to see if the documents showed improper influence.

HSUS's arguments fail because the underlying premise—that the trial court improperly adopted a categorical exemption, shifted the burden, and failed to apply the section 6255 balancing test to the content of each document—is flawed. That is not what the trial court did. Although the court did order the documents divided into categories (no influence, influence, and improper influence), the trial court did apply the balancing test to each document. This is reflected in the trial court's August 2009 amended order of reference, in which the trial court emphasized that it would closely examine "the facts surrounding the statements made" in each document and its October 2010 order granting the writ petition in part, which stated with respect to the 3,100 pages, "Applying the above findings and conclusions to each document [the Regents] withheld from disclosure and *after careful review of the documents* and considering the parties' arguments, the competent evidence submitted in support thereof, the Special Master's amended report, and whether any reasonably segregable portion of a document should be disclosed, the Court orders [disclosure of 28 pages of specified documents] . . . ." (Italics added.)

Moreover, the content of some of the records disclosed pursuant to the court's October 2010 order—documents HSUS considers to be damning to the Regents—confirms that the trial court did what it said it had done. For example, HSUS's brief in this court says "Documents disclosed after the October 2010 hearing and order demonstrate that an Agribusiness Executive with Bank of America was involved in the funding of the study, and review of drafts, contrary to The Regents' claims."[25] Other documents discussed by

---

[25] In an e-mail to Sumner dated March 13, 2008, Cornelius Gallagher, a Bank of America agribusiness executive, wrote: "I am working on getting the UC AIS Egg study funding set up and would like a budget or cost estimate update to use to assure timely payment. [¶] No rush but also need to know if you want lump sum or progress payment?? [¶] Your original guess

HSUS that were disclosed by the court also show the court did consider each document and did not apply a categorical exemption.[26]

HSUS views these documents as evidence of improper influence, whereas the trial court stated it found no documents showing improper influence but instead ordered disclosure of these documents for the express reason that it found no exemption applied. The trial court's reasoning, although not stated, is apparent. No exemption applies to a document which suggests a bank may have contributed or offered to contribute funding to a study. It was therefore not necessary for the trial court to conclude such documents might show improper influence. All such documents would have been disclosed by the trial court, not because they could be stretched to fit HSUS's argument of bias in the study, but because such documents are not exempt.

That the trial court did separately consider each document is further shown by HSUS's rule 8.486(b)(3)(A) summary of the hearing, in which HSUS's counsel stated, "I further objected to Judge Reed's tentative on the basis that he developed the 'improper influence' standard not based on the content of the documents, but on general policies, and then he looked at the documents to see if the 'improper influence' standard was met; instead of engaging in the public interest balancing based on the actual content of each document. *Judge Reed did not agree with my argument*." (Italics added.)

 Contrary to HSUS's view, our decision in this case will not create an academic researcher's exemption immunizing disclosure of university documents in future cases. A decision regarding the catchall exemption is necessarily limited to the facts of the particular case. (*ACLU, supra*, 32 Cal.3d at p. 454, fn. 14.) A case-by-case balancing process is required. (*CBS, supra*, 42

was $10,000 to $15,000 but now you have a better scope of work knowledge so may be able to button down to a max . . . [.] [¶] Thanks for making this one of your projects and dedicating the resources to getting it done on time. . . ." (Original ellipses.)

In an e-mail to Sumner dated April 11, 2008, Gallagher wrote: "Egg leaders called and have grave concern on progress of study . . . [¶] let me know how I can help. [¶] thanks." (Original ellipses.)

In an e-mail to Sumner dated May 14, 2008, Gallagher wrote: "They hoped for a draft today . . . any chance? [¶] Sorry to bug you but I know they will call." (Original ellipses.)

[26] HSUS points out that in an internal e-mail dated July 11, 2008, from Sumner to Joy Mench, one of the AIC researchers involved in the Economic Effects study, Sumner wrote: "I defer to your judgment on the rebuttal statement." HSUS does not note in its briefing that Sumner also wrote: "The vets on both sides are signing on to the economic arguments that make no sense. I wonder where they got their expertise on those topics? [¶] We could write a rebuttal to both pro and con! That would be pretty confusing, eh. (Just a joke.)"

In an internal e-mail dated October 11, 2008, from Sumner to Lynnette Temple, UCD information practices coordinator, Sumner wrote: "These two emails between Joy and me do not deal with our report but our conversation about the draft pro and con arguments about the initiative. Discuss please."

Cal.3d at pp. 656–657; *County of Santa Clara, supra,* 170 Cal.App.4th at p. 1321.) "Thus our decision against requiring disclosure is necessarily limited to the facts of this particular case; in another case, with different facts, the balance might tip in favor of disclosure of nonexempt information . . . ." (*ACLU, supra,* 32 Cal.3d at p. 454, fn. 14.) We hold here only that the interests advocated by the Regents are legitimate interests to be weighed in the section 6255 catchall exemption balance.[27]

We accordingly reject HSUS's claim that the trial court created a categorical exemption.

### B. The Balancing Test

#### 1. *Public Interests in Nondisclosure*

As indicated in our discussion of HSUS's evidentiary challenge to Sumner's declaration, Sumner's description of the academic research process and this study's conformance to that process support a conclusion that disclosure of the communications would fundamentally impair the academic research process. Moreover, as Sumner alluded, the public would suffer because the "quantity and quality" of the AIC's academic research on important issues of public interest would be adversely affected.

We are not the first court to recognize the chilling effect disclosing prepublication research communications could have on academic research or the negative impact such disclosure would have to the quantity and quality of studies and reports produced for the public by that research. Two federal courts have noted these public interests as well.

The court in *Dow Chemical Co. v. Allen* (7th Cir. 1982) 672 F.2d 1262 (*Dow Chemical*), recognized these public interests in the context of a subpoena for various research materials concerning an ongoing toxicity study conducted by a university. The study involved certain chemicals in an herbicide manufactured by Dow Chemical, which was defending in an herbicide cancellation proceeding. (*Dow Chemical, supra,* 672 F.2d at pp. 1265–1266.) The court held that researchers' interest in academic freedom could properly figure into the legal calculation of whether to order disclosure of the researchers' notes, reports, working papers, and raw data. (*Id.*

---

[27] California courts recognize a "deliberative process privilege" under section 6255's catchall exemption, but it has been applied to policymakers (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1342 [283 Cal.Rptr. 893, 813 P.2d 240]; see *id.* at p. 1343), not to academic research. Here, we do not hold there is an academic research privilege. We hold only that, based on the facts of this case, supported by the evidence we have discussed, the public interests identified by the Regents should be weighed in the balance.

at pp. 1276–1277.) Disclosure would " 'inevitably tend[] to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor.' " (*Id.* at p. 1276.) " 'Privacy . . . contributes to learning . . . by insulating the individual against ridicule and censure at early stages of groping and experimentation. No one likes to fail, and learning requires trial and error . . . . In the absence of privacy we would dare less, because all our early failures would be on record. We would only do what we thought we could do well. Public failures make us unlikely to try again.' " (*Id.* at fn. 24, quoting Gavison, *Privacy and the Limits of Law* (1980) 89 Yale L.J. 421, 448.)

In *Cusumano v. Microsoft Corp.* (1st Cir. 1998) 162 F.3d 708 (*Cusumano*), the court held that Microsoft was not entitled to production of academic research materials, which it wanted to use in defending an antitrust case. (*Cusumano, supra,* at p. 710.) Reasoning that academic researchers are like journalists, the court observed that if academic research materials were freely subject to subpoena, researchers' sources likely would refuse to confide in them. (*Id.* at p. 714.) The court further noted, "Just as a journalist, stripped of sources, would write fewer, less incisive articles, an academician, stripped of sources, would be able to provide fewer, less cogent analyses." (*Ibid.*)[28]

As noted by HSUS, *Dow Chemical* was a discovery case, not a public records case. So too was *Cusumano*. We think this distinction is without significance in the context of this CPRA case because we consider both cases only for the proposition that the interests advanced by the Regents here are recognized legitimate public interest concerns. Consequently, like the trial court, we factor those concerns into the section 6255 catchall balancing in this case.

 HSUS contends that the district court in *Southwest Center for Biological Diversity v. USDA* (D.Ariz. 2000) 170 F.Supp.2d 931 (*Southwest*), found *Dow Chemical* unpersuasive. However, while noting that the *Dow Chemical* court did not mention a " 'privilege' for research data," the court in *Southwest* acknowledged that *Dow Chemical* stands for the "unremarkable proposition that, in specific situations, research material may be entitled to some protection" and, in recognizing that protection, the *Dow Chemical* court

---

[28] Both *Dow Chemical* and *Cusumano* were grounded on the notion that forcing the academicians in those cases to disclose their research materials would endanger the value of academic freedom safeguarded by the First Amendment. (*Dow Chemical, supra,* 672 F.2d at pp. 1276–1277; *Cusumano, supra,* 162 F.3d at pp. 714, 717.) *Cusumano* also noted that this infringement would further violate the First Amendment by jeopardizing the future information-gathering activities of academic researchers. (*Cusumano, supra,* 162 F.3d at p. 714.) The Regents have not grounded their position on the First Amendment and by discussing *Dow Chemical* and *Cusumano*, we do not hold that the First Amendment has application here.

"balanced the burdens and benefits of compliance with the subpoenas and found that, on the specific facts of the case, the burden was unreasonable." (*Southwest, supra,* 170 F.Supp.2d at p. 942.) We too conclude that research material, on balance, *may* be protected, depending on the facts of a case.

Because HSUS implies that *Southwest* rejects consideration of the interests asserted here in public records request cases, we note several important distinctions. First, the FOIA request in *Southwest* was for data, not prepublication thoughts, conversations, and back-and-forth exchanges of ideas between researchers. In *Southwest,* the FOIA request related to data utilized in a government report on the status of the goshawk, as a threatened or endangered species. (*Southwest, supra,* 170 F.Supp.2d at p. 936.)[29] There was no assertion that disclosure would impair research by chilling prepublication communication. Here, the need for nondisclosure is supported by Sumner's opinions. Those assertions are buttressed by the observations of the courts in *Dow Chemical* and *Cusumano,* as well as this court's previously articulated "perception that 'those who expect public dissemination of their remarks may well temper candor with a concern for appearance,' is based on 'human experience' . . . . [Citation.]" (*California First Amendment Coalition, supra,* 67 Cal.App.4th at p. 174.)

Second, the researchers in *Southwest* were not academic researchers like Sumner and the AIC team, and the district court had no occasion to consider the impact disclosure might have on academic research and the public's interest in the quality and availability of academic publications. Indeed, this distinguishing fact was not lost on the district court in *Southwest* as the court noted, "Reynolds is not a private researcher in academia; rather, his work is paid for by the government and conducted for public purposes." (*Southwest, supra,* 170 F.Supp.2d at pp. 942–943.) And, as the court further noted, there was no showing that disclosure of the data would be burdensome. (*Id.* at p. 943.) Reynolds was the government's leading researcher involved in studies of the northern goshawk. His research assisted the United States Fish and Wildlife Service in determining whether the goshawk should be listed as a threatened or endangered species. (*Id.* at p. 936.) Data that is the result of research done for a governmental entity to inform and support an official decision of that entity may very well present a different set of interests than those presented in the academic setting where prepublication communications are at issue.

---

[29] The categories of materials sought included: "1) data about the Kaibab Plateau population of the red squirrel, the goshawk's primary prey; 2) data from [the researcher's] radio-tracking study of the Kaibab goshawks; 3) all records relating to the funding of the radio-tracking study; 4) a list containing the location of all identified territories and nest sites on the Kaibab Plateau; 5) all information regarding activity at all known nest sites from 1991 through 1996; and 6) maps showing all timber management activities on the Kaibab Plateau." (*Southwest, supra,* 170 F.Supp.2d at p. 937.)

 Lastly, the FOIA has no analogue to the CPRA's catchall exemption in section 6255. (*ACLU, supra,* 32 Cal.3d at p. 452.) The agency in *Southwest* sought to prevent disclosure under the fifth enumerated FOIA exception set forth in title 5 United States Code section 552(b)(5), which exempts: "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." That exemption has been construed by federal courts to " 'shield[] ". . . only those documents . . . normally privileged in the civil discovery context." ' " (*Southwest, supra,* 170 F.Supp.2d at p. 939.) This, of course, explains the *Southwest* court's focus on the nonexistence of a privilege. The district court determined that the materials requested would not generally be protected in litigation with the agency and, as a consequence, were not protected. (*Id.* at p. 943.) Here, under section 6255, we are tasked with weighing on the nondisclosure side of the balance whatever public interests have been identified and established by evidence.

HSUS relies on cases involving third parties who gave information to a governmental entity. In the cited cases, the courts held that those people had a reduced expectation of privacy due to acceptance of government benefits, such as public employment. (E.g., *SCERS, supra,* 195 Cal.App.4th at p. 468 [public salary information is an aspect of government operations, the disclosure of which contributes to the public's understanding and oversight of those operations by allowing interested parties to monitor the expenditure of public funds].) These cases are of no help to HSUS.

HSUS also cites authority holding that voluntary entry into the public sphere diminishes one's privacy interests. However, one of the cases cited is an unpublished opinion and hence not citable as precedent.[30] The others are distinguishable. The court in *CSU, Fresno, supra,* 90 Cal.App.4th 810, cited by HSUS, held that donors to a university arena who purchased luxury suites at the arena, which constituted a valuable commercial benefit for them, voluntarily diminished their own privacy interests, and the intrusions on privacy were minimal. (*Id.* at p. 834.) The court in *San Gabriel Tribune v. Superior Court* (1983) 143 Cal.App.3d 762 [192 Cal.Rptr. 415], held a waste disposal company's pursuit of a rate increase in its contract with the city was tantamount to a waiver of any privacy interests it may have had in the financial data submitted to the city to justify the increase.

---

[30] The California Rules of Court authorize reference to unpublished opinions only in a narrow set of circumstances, none of which applies here. (See rule 8.1115(b); *People v. Williams* (2009) 176 Cal.App.4th 1521, 1529 [98 Cal.Rptr.3d 770].) Consequently, we disregard the citation to *Coalition of University Employees v. The Regents of University of California* and the near one and a half pages HSUS devotes to discussion on that case.

Here, the intrusions would have been into the academic research process, not minimal individual privacy interests. And, based on the evidence, the impact that would result from disclosure here is *not* minimal.

At oral argument, HSUS cited this court's decision in *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296 [140 Cal.Rptr.3d 459]. That case involved a CEQA (California Environmental Quality Act; Pub. Resources Code, § 21000 et seq.) challenge in which the trial court applied the deliberative process privilege to exclude from the administrative record e-mails between the city's staff and its consultants regarding preparation of the revised EIR (environmental impact report). (205 Cal.App.4th at p. 305.) The city had asserted the privilege should be applied because it was necessary to " 'foster candid dialogue and a testing and challenging of the approaches to be taken' " in the context of the preparation of an EIR. (*Citizens for Open Government, supra*, 205 Cal.App.4th at p. 306.) This court held that the city's mere reliance on the policy of why the "privilege in general is necessary" was insufficient to explain the public's specific interest in nondisclosure. (*Id.* at p. 307.) "The city therefore failed to carry its burden to explain what the public's specific interest in nondisclosure was *in this case.*" (*Ibid.*, original italics.) In contrast, *in the instant case*, the Regents supported their assertion with expert opinion evidence and explained specific interests in nondisclosure, including preventing a diminution in the quantity and quality of studies from which the public benefits. The trial court reviewed each document here with that evidence in mind. *Citizens for Open Government* is of no help to HSUS.

The evidence here supports a conclusion that disclosure of prepublication research communications would fundamentally impair the academic research process to the detriment of the public that benefits from the studies produced by that research. The trial court accommodated that interest by examining the documents for potential improper influence, which would weigh on the disclosure side of the balance.

### 2. *Public Interest in Disclosure*

"Openness in government is essential to the functioning of a democracy." (*International Federation, supra*, 42 Cal.4th at p. 328.) Accordingly, the CPRA provides a presumption of openness—"[t]he records at issue are presumptively open because they contain 'information relating to the conduct of the public's business.' " (42 Cal.4th at pp. 336–337.)

This court has previously discussed how to weigh that general public interest in the balance. " 'If the records sought pertain to the conduct of the people's business there *is* a public interest in disclosure. The *weight* of that

interest is proportionate to the gravity of the governmental tasks sought to be illuminated and the directness with which the disclosure will serve to illuminate.' (*Citizens for a Better Environment* v. *Department of Food & Agriculture* (1985) 171 Cal.App.3d 704, 715 [217 Cal.Rptr. 504], italics added (*Citizens for a Better Environment*).) The existence and weight of this public interest are conclusions derived from the nature of the information." (*Connell v. Superior Court* (1997) 56 Cal.App.4th 601, 616 [65 Cal.Rptr.2d 738] (*Connell*); accord, *County of Santa Clara, supra*, 170 Cal.App.4th at p. 1324.)

As the court put it in *County of Santa Clara* and *City of San Jose*, "the issue is 'whether disclosure would contribute significantly to public understanding of government activities.' " (*County of Santa Clara, supra*, 170 Cal.App.4th at p. 1324, quoting *City of San Jose, supra*, 74 Cal.App.4th at p. 1018.) Thus, in assigning *weight* to the general public interest in disclosure, courts should look to the "nature of the information" and how disclosure of that information contributes to the public's understanding of government.

■ We agree with HSUS that the objectivity of public university researchers is of vital importance. We also agree that when a public university releases a report on the effects of a proposed California ballot initiative before a statewide election, there is a public interest in reviewing public records to, as HSUS puts it, "ensure that the university: (1) reached accurate conclusions based on sound methodology; (2) was not influenced by outside industries or individuals with a private/business interest in the outcome of the ballot initiative; and (3) did not have a monetary motivation to reach a certain conclusion."

However, the evidence here suggests an alternative to achieve the goal of ensuring accurate conclusions based on sound methodology. As the Regents point out, a published report itself states its methodology and contains facts from which its conclusions can be tested. As noted by Sumner, published academic studies are exposed to extensive peer review and public scrutiny that assure objectivity. Here, given the public interest in the quality and quantity of academic research, we conclude that this alternative to ensuring sound methodology serves to diminish the need for disclosure. Moreover, given that the prepublication written communications are in jargon and involve midstream thinking, some of which was by junior researchers and some of which were supplemented during the research process with undocumented oral conversations, we conclude that the value of these documents to evaluate the conclusions and methodology is minimal.

HSUS argues some of the documents disclosed after the October 7, 2010 hearing demonstrate grounds to question the study's funding and conclusions. Therefore, production of all the other documents (or at least the documents

categorized as showing influence though not improper influence) is required. As we alluded to earlier, HSUS interprets some documents as evidence that, contrary to the Regents' assertion that the study was solely funded by UC, the researchers received private funding from special interests and got too close to the politics of the ballot initiative, in violation of section 8314's prohibition against using public resources for campaign activity.[31]

■ HSUS proves too much. To the extent the trial court ordered disclosure of documents HSUS views as helpful to its case, HSUS got what it wanted, e.g., the Bank of America e-mail concerning possible funding for the study. To the extent HSUS asks us to assume that there must be more of the same in the undisclosed documents, that is pure speculation. We presume the trial court performed its duty (Evid. Code, § 664 [presumption that official duty was regularly performed]) and did what it said it would do. Had there been other such documents which were also nonexempt, the trial court would have ordered them disclosed. Accordingly, we do not need to address the parties' arguments as to whether the disclosed documents demonstrate impropriety by the researchers.[32]

### 3. "Influence" Versus "Improper Influence"

HSUS claims the trial court reviewed the documents with an eye toward only disclosing documents that showed "improper influence" and that "improper influence" is an arbitrary and unworkable standard. The trial court's decision to look for "improper influence" in the documents must be examined in the context of HSUS's arguments. Based on the record before us, we conclude that HSUS framed the balancing test by focusing the court on "improper influence." This was noted by the trial court in its August 2009

---

[31] In the petition memorandum, HSUS points us to several e-mails that were ordered disclosed after the October 2010 hearing. We have considered only those e-mails that bear Bates-stamp numbers showing they were among the documents ordered disclosed by the trial court in October 2010. (See fns. 25, 26, *ante*.)

[32] The Regents cry foul because HSUS did not "offer its current spin" in the trial court on some of the e-mails it references here; hence the Regents were not able to rebut the arguments only now advanced with evidence in the trial court. The Regents complain that they are precluded from submitting a new declaration because new evidence cannot be presented on review. The Regents point out that in the trial court they rebutted the notion that outside sources contributed financially to the study. As we have noted, Sumner attested in his November 29, 2008 declaration that "[t]he study was funded solely by UC funds." (Italics omitted.) We allowed the Regents to file supplemental opposition. The Regents did, and in the supplemental opposition it is suggested that the March 13, 2008 e-mail to Sumner from Gallagher related to proposed funding Sumner ultimately declined. The Regents urge us to disregard HSUS's new arguments based on this e-mail. We need not resolve these disputes. However, we do not disregard the e-mail or the others referenced in footnotes 25 and 26, *ante*, because they support our conclusion that the court reviewed all the documents and ordered disclosure of those documents that should have been disclosed.

amended reference order and its October 2010 order granting in part and denying in part the petition.

In the August 2009 amended reference order, the trial court wrote, "Petitioner claims that the egg and/or poultry industry *improperly influenced* the conduct or result of the study . . . ." (Italics added.) Citing HSUS's supplemental opening brief, HSUS's response to the Regents' supplemental brief, and a declaration filed by HSUS, the trial court wrote in its October 2010 order, "[HSUS] seeks the production of records that show that the egg and/or poultry industry *improperly influenced* the AIC study."[33] (Italics added.) Here, HSUS similarly advocates that there is "an exceptionally strong public interest in ensuring that a publicly funded analysis of ballot propositions are [*sic*] not *improperly influenced*." (Italics added.) It appears that the trial court sought to accommodate the concerns raised by HSUS's argument when it used the label, "improper influence."

As we have noted, the trial court disclosed documents consisting of 28 pages it found to be nonexempt. In our view, even under the public interest focus HSUS advocated in the trial court, there was no need to determine whether a document showed "improper influence" if the document was not potentially exempt. And the evidence suggests that is exactly what the trial court did. It ordered the disclosure of 28 pages of documents, for the reason that the Regents "failed to establish that an exemption applies." Thus, contrary to HSUS's contentions here, the trial court was not myopically focused on disclosing only documents that showed "improper influence."

Moreover, we see HSUS's focus on the trial court's labels as an argument over semantics which is conflated into an assertion about what the court did or did not do in its balancing analysis. The labels are not controlling. As evidenced by the examples the trial court gave of "improper influence" and "influence" in its August 2009 amended reference order, we conclude that, in essence, what the trial court did was simply to distinguish between "influence" in its coercive connotation[34] and the noncoercive "impact"[35] that input would naturally have on the results of the study. The latter relates to contributions to the study from external sources, which are consistent with the social science research processes Sumner described. Indeed, Sumner attested that obtaining information from industry representatives is "a basic principle of social science" research. Thus, we reject HSUS's contention that "any influence is ipso facto improper."

---

[33] As we noted earlier, these briefs are conspicuously absent from the record. So too is the declaration.

[34] One definition of "influence" is "corrupt interference with authority for personal gain." (Merriam-Webster's Collegiate Dict., *supra*, at p. 641.)

[35] "Impact" means "to have a direct effect" on something. (Merriam-Webster's Collegiate Dict., *supra*, at p. 622.)

HSUS alleges the trial court never defined "improper influence." As we have noted, the record does not support this claim. HSUS failed to provide this court with a transcript of the hearing at which the trial court and counsel discussed the definition. HSUS's rule 8.486(b)(3)(A) summary of the hearing reflects the term was discussed, and the trial court rejected HSUS's objection to the term. The court had earlier put the definition in context by giving examples of improper influence in its August 2009 amended reference order. Moreover, the trial court indicated "[a] close examination of the facts surrounding the statements made [in the documents] is required to determine whether influence is improper or not."

In support of the argument that the trial court should have ordered disclosure of the documents that showed *any* influence on the study, HSUS argues that, in other contexts, California authorities deplore influence on or by public agents without adding the modifier "improper." However, the authorities cited by HSUS do contain modifiers that connote improprieties. (Gov. Code, §§ 15626, subd. (c) [no member of the State Board of Equalization *who has received a contribution from a party shall attempt to use his or her official position* to influence the decision], Gov. Code, § 3560, subd. (c) [legislative intent to provide a system of higher education with academic freedom and insulation from *political* influence]; Ed. Code, § 66607 [university shall be independent of *political and sectarian* influence]; *Stockton Plumbing & Supply Co. v. Wheeler* (1924) 68 Cal.App. 592, 602 [229 P. 1020] [public officer should be free from any influence *other than that which may directly grow out of the obligations he owes to the public at large*].)

HSUS also relies on the UC Davis Policy and Procedure Manual, contending that nowhere in that publication is there a reference to "improper influence." HSUS cites language from the manual, implying that even the perception of "influence" is prohibited. But HSUS apparently overlooks the import of the language it cites, which states that principal investigators and key personnel are responsible for "[c]onducting the sponsored research or educational activity in a manner that will avoid a perception that the project could be influenced or biased *by conflicts of interest*." (Italics added.) The manual defines conflict of interest as "a situation that occurs when the conduct of research could be compromised or appear to be compromised by a related financial interest of the principal investigator or key personnel." Contrary to HSUS's assertion that no reference is made to "improper influence," we read the italicized phrase as clearly referencing the type of influence the manual seeks to address, and it can hardly be argued that influence that is the result of a conflict of interest is not a form of improper influence.

Here, the trial court adopted an interpretation of "influence," pursuant to which some documents would weigh heavily in favor of CPRA disclosure

and others would not. In doing so, the trial court did exactly what it was required to do. It determined the *weight* of the public interest from the " 'nature of the information' " in the documents and how disclosure of that information would contribute to the public's understanding of government. (*County of Santa Clara, supra,* 170 Cal.App.4th at p. 1324, quoting *Connell, supra,* 56 Cal.App.4th at p. 616; see *Citizens for a Better Environment, supra,* 171 Cal.App.3d at p. 715.) The court then essentially concluded that requiring disclosure of documents showing "influence" of the sort that results from contributions of information to the study would fundamentally impair the academic research process, and in exchange, the public would receive little benefit. We agree. Weighing the negative impact on the academic research process in this case and the resulting diminution in the quality and quantity of future studies from which the public can benefit, we conclude that the public interests on the nondisclosure side of the balance here clearly outweigh the public interests on the disclosure side.

HSUS asserts here that the public has an interest in documents that would reveal violations of university policy and state law concerning prohibitions against political campaign activity. However, the record does not reflect that HSUS asserted in the trial court this public interest theory. As we have noted, we are without transcripts and HSUS's trial court briefs in which this public interest theory would logically have been asserted. Moreover, no mention is made of it in counsel's rule 8.486(b)(3)(A) declaration. The record before us reflects only the trial court's observation in its August 2009 amended reference order and October 2010 order on the petition that HSUS's trial court briefing indicated HSUS was seeking "records that show that the egg and/or poultry industry *improperly influenced* the AIC study." (Italics added.) Indeed, the HSUS's original CPRA request did not expressly request documents that might reflect violations of university policy or California law; it merely requested records pertaining to university practices, policies and regulations concerning participation in political campaigns.[36] On this record, we must assume HSUS did not assert a public interest in disclosure of political campaign prohibition violations.

▮▮▮ The CPRA placed the burden on the Regents to show in the trial court that the public interest in nondisclosure clearly outweighed the public interest in disclosure, and the Regents met that burden. It would be unfair to allow HSUS to change theories on appeal by asserting new interests in disclosure. " 'The rule is well settled that the theory upon which a case is

---

[36] Specifically, HSUS's request reads: "Any and all records (including but not limited to correspondence, memoranda, e-mail reports and studies) *regarding all practices, policies and regulations* concerning participation in political campaigns by university employees and agents. Any response to this request must include, but not be limited to, correspondence concerning and limitations on such activities." (Italics added.)

tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' " (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1350–1351, fn. 12, 2d par. [82 Cal.Rptr.3d 229, 190 P.3d 586].)

We recognize we have discretion whether to consider new issues, and appellate courts often do so if the issue involves legal questions of public interest. (*Resolution Trust Corp. v. Winslow* (1992) 9 Cal.App.4th 1799, 1810 [12 Cal.Rptr.2d 510].) " 'There are many situations where appellate courts will consider [matters raised for the first time on appeal]. They will often be considered where the issue relates to questions of law only. [Citations.] Appellate courts are more inclined to consider such tardily raised legal issues where the public interest or public policy is involved. [Citations.] And whether the rule shall be applied is largely a question of the appellate court's discretion.' [Citations.]" (*Ibid.*; see *Avalos v. Perez* (2011) 196 Cal.App.4th 773, 776–777 [127 Cal.Rptr.3d 106] [appellate court has discretion to consider new issues where public interest is involved].) Here, although this new theory involves a public interest, it does not involve a pure question of law, because HSUS is challenging the trial court's review of individual documents. We decline to consider HSUS's new public interest theory related to disclosure of political campaign prohibition violations.

Even if we were to consider this theory on the record before us, we would reject it. Documents reflecting political campaign prohibition violations would have been nonexempt. That the trial court disclosed 28 pages of nonexempt documents suggests to us that the court would have disclosed documents reflecting political campaign prohibition violations had such documents existed.

In its replication, HSUS belatedly asserts that the trial court limited its review to influence by the egg and poultry sector instead of looking for evidence of influence by other sectors of agriculture and banks. As we have discussed, the court actually did provide the communications from a Bank of America executive who apparently represents the bank's interest in agriculture, after concluding those communications were nonexempt. Based on that disclosure, we are confident that if the trial court had come across documents in its page-by-page in camera review that were either not exempt or that reflected improper influence from some other source, it would have disclosed them.

In its replication, HSUS argues for the first time that the trial court and the Regents failed to explain why the trial court disregarded the special master's recommendation for disclosure of all documents showing simple "influence."

We conclude that the reason the trial court rejected the special master's recommendation on disclosing documents that showed only simple, noncoercive influence is obvious. The court did not agree with the special master's balancing analysis and neither do we.

### 4. *Segregation of Information*

HSUS argues the trial court never attempted to segregate and redact nondisclosable information from disclosable information. We disagree.

 Section 6253, subdivision (a), provides, ". . . Any reasonably segregable portion of a record shall be available for inspection by any person requesting the record after deletion of the portions that are exempted by law." As a general principle, " 'where nonexempt materials are not inextricably intertwined with exempt materials and are otherwise reasonably segregable therefrom, segregation is required to serve the objective of the [CPRA] to make public records available for public inspection and copying unless a particular statute makes them exempt.' The burden of segregating exempt from nonexempt materials, however, remains one of the considerations which the court can take into account in determining whether the public interest favors disclosure under section 6255." (*ACLU, supra*, 32 Cal.3d at p. 453, fn. 13.)

Here, after production of the 356 pages of documents, the trial court reviewed each of the 3,100 remaining pages and ordered disclosure of an additional 28 pages. The court also ordered disclosure of names of persons contained within the withheld documents (other than the names of egg producers) and ordered these names could be produced in a redacted copy of the biographical index rather than ordering redaction of all the nondisclosed documents to delete all but the names. The trial court indicated in its order that it had considered "whether any reasonably segregable portion of a document should be disclosed." On the record before us, we reject HSUS's bald assertion that it is "unimaginable" that every line of text in the withheld documents is so vital to promoting research that it cannot be segregated and disclosed.

HSUS argues in its petition there is no·compelling reason to withhold e-mail headers. It contends that the headers would show "the names of individuals, email addresses, who they were corresponding with, and on what dates." The Regents responded that the absence of a hearing transcript makes it impossible to determine whether HSUS raised this point in the trial court and that counsel for the Regents has no recollection e-mail headers were discussed. For the first time, as far as we can tell from the record, HSUS asserts in its replication that disclosure of the e-mail headers would benefit the public by creating a timeline of when the Regents were in contact with

specific individuals. HSUS further asserts in the replication that the timeline is important because the study was released just months before the election.

We note that counsel did mention the e-mail headers in his rule 8.486(b)(3)(A) summary, stating that he argued to the trial court that "at a minimum [the trial court] should release all the names and email headers on the documents because they have nothing to do with promoting research." The record does not show, however, that counsel asserted there was a public interest in creating a timeline. For the reasons we declined to consider HSUS's new political campaign prohibition violation public interest theory, we decline to consider this theory as well.

Weighing the public interests asserted in the trial court and sup-ported by the evidence, we conclude that the public interests in nondisclosure outweigh the public interests in disclosure. Thus, HSUS is not entitled to a peremptory writ of mandate.

### DISPOSITION

HSUS's petition for a peremptory writ of mandate and/or prohibition is denied. Having served its purpose, the alternative writ of mandate is dis-charged. The parties shall bear their own costs in this writ proceeding. (§ 6259, subd. (d); rule 8.493(a)(1)(A).)

Nicholson, Acting P. J., and Butz, J., concurred.